393 A.2d 1092.

UNITED STATES OF AMERICA *v.* PUBLIC UTILITIES
COMMISSION.

NOVEMBER 1, 1978.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

JOSLIN, J.    In this case the Secretary of Defense, on behalf of the Department of Defense and all other executive agencies of the United States (the Secretary), is seeking review of a June 18, 1976 order of the Public Utilities Commission (the commission) approving a rate increase for the Newport Electric Corporation (Newport) and a revised rate structure for its customers.

The record discloses that on March 29, 1974, Newport, faced with a loss of revenue precipitated in large part by a withdrawal by the United States Navy (the Navy) of its fleet operations from the Newport area, filed with the commission

a schedule of new and revised rates to become effective on May 1, 1974. Those rates were designed to increase Newport's annual gross revenue by approximately $1½ million. To achieve that overall additional revenue, Newport proposed increases in the tariffs for its several classes of customers ranging from a low of 11 percent for commercial services to a high of 20 percent for street lighting with an average proposed increase of 15.86 percent. The increase requested for the Navy at its installations serviced by Newport was 17.98 percent.

After a preliminary analysis of the filing, the commission granted Newport an interim increase of approximately $1 million to take effect August 1, 1974 and to remain operative until final disposition of the filing by the commission.

At the hearings thereafter held, the Secretary did not — nor does he now — challenge Newport's entitlement to additional revenue. Instead, his position was then — as it is now — that the rates proposed to be charged the Navy were excessive and that the total overall increase was not fairly and justly apportioned among Newport's various customer classes.

Because Newport had not included in its filing any data which would permit a full response to that contention, the commission requested it to prepare a study that would show the cost of providing service to the Navy. That limited study was undertaken by Newport's consultants and, when completed, disclosed that the return on Newport's investment in service to the Navy was 63.5 percent higher than the return on the cost of providing service to all other customers, excluding the Navy, and 54.7 percent higher than the return on all others, including the Navy.

The Secretary then contended that the 63.5 percent differential supported his position that the rates proposed for the Navy were both unreasonable and unjustly discriminatory. Notwithstanding, he was not permitted to question the consultants regarding the cost of serving customers other than

the Navy. The commission's ground for foreclosing that line of inquiry was that the information sought to be elicited was not within the scope of the limited cost-of-service study undertaken by the consultants and could only be generated by a cost-of-service study that fully allocated the total costs of providing services among all Newport's customer classes. The commission refused to order that kind of study because, in it judgment, the $30,000 to $40,000 expense involved in its preparation would ultimately be borne by Newport's customers, and the commission felt that such a large expense was unjustified for a utility of Newport's limited size. The Secretary did not fill the gap by presenting such a study as part of his own case.

The commission's final order of June 1976 granted permanent rate relief by approving the rates previously authorized on an interim basis, thus increasing Newport's revenues by approximately $1 million. In addition, the commission in approving the rate design filed by Newport, rejected the Secretary's request for a reduction of the rates charged the Navy on two grounds. The first was that "[t]he Navy has not shown that it is discriminated against as compared to other customers of the Newport Electric Corporation of comparable size with respect to the overall sales of the Company"; the second, that even assuming such discrimination, the evidence of the Navy's recent partial withdrawal from the Newport area and the absence of any guarantee that it would not further abandon its Newport facilities or curtail planned construction consigned the Navy's continued presence in the area to the "realm of the speculative" and furnished reasonable grounds for characterizing Newport's planned investment with respect to the Navy as an "investment of relatively high risk," which in turn provided "a factual and evidentiary basis for some such discrimination." On review, the Secretary challenges the validity of both footings upon which the commission's order rests.

Initially, the Secretary contends that the commission erred in finding that he failed to make "a sufficient showing of dis-

crimination against the Navy as a single customer to justify any extraordinary relief for that customer through a rate adjustment." Central to that contention is G.L. 1956 (1977 Reenactment) §39-3-12 which provides in pertinent part that:

> "At any such hearing involving any proposed increase in any rate, toll or charge, the burden of proof to show that such increase is necessary in order to obtain a reasonable compensation for the service rendered shall be upon the public utility * * * ."

This section, the Secretary argues, places on Newport, not on him, the burden of establishing that the proposed rate design does not unfairly discriminate among its customer classes. Read literally the statute might impose on a utility only the burden of proving that a general overall increase in its return is necessary. In our judgment, however, so literal a reading is unduly restrictive. The language used by the Legislature, if not explicitly, at least by clear implication manifests its intention that a utility seeking an increase in rates establish not only that it requires an overall increase, but that its proposed schedule of rates is nondiscriminatory. *See Metropolitan District Commission v. Department of Public Utilities*, 352 Mass. 18, 24-25, 224 N.E.2d 502, 507 (1967); *Re New England Telephone & Telegraph Co.*, 71 P.U.R. (n.s.) 243, 266 (N.H.P.S.C. 1947); *Re Capital Mobile Radio Service, Inc.*, 80 P.U.R.3d 445, 453 (N.Y.P.S.C. 1969); *United Fuel Gas Co. v. Public Service Commission*, 154 W. Va. 221, 232-33, 174 S.E.2d 304, 311 (1970); *Re Black Hills Power & Light Co.*, 68 P.U.R.3d 82, 91-92 (Wyo. P.S.C. 1967). Indeed, to construe the statute as being broad rather than narrow in scope constitutes no more than a recognition that in its enactment the Legislature was mindful of the general principle that a moving party must prove its case.

Because the commission made no attempt either in its report and order or in its brief to justify imposing upon the Secretary the burden of establishing the impropriety of the

rate design, we can only speculate on the basis for its action. One reason may have been that it read §39-3-12 more literally than we have. Another may have been that it construed the Secretary's challenge as an attempt to obtain a reduction or other adjustment in an existing and previously approved rate design. In that event the burden of justifying a change in the existing rate would have been on the party seeking that change — in this case the Secretary — rather than on the utility. *Swift & Co.* v. *United States,* 343 U.S. 373, 382-83, 72 S. Ct. 716, 721, 96 L. Ed. 1008, 1018-19 (1952); *Metropolitan District Commission* v. *Department of Public Utilities,* 352 Mass. at 24-25, 224 N.E.2d at 507; *United Fuel Gas Co.* v. *Public Service Commission,* 154 W. Va. at 232-33, 174 S.E.2d at 311.

A third possible explanation is that the commission did not distinguish between the rule to be applied where the increase in rates for the several customer classes is at varying percentages and the rule that obtains where the increase is spread proportionately across-the-board among those classes. In the latter circumstance, the fact that the regulatory body had previously approved the general rates upon which identical percentage increases are superimposed and that those rates had continued in effect without challenge, creates a presumption that the new rates are reasonable and non-discriminatory. *City of Terre Haute* v. *Terre Haute Water Works Corp.,* 133 Ind. App. 232, 246, 180 N.E.2d 110, 117 (1962); *City of West Allis* v. *Public Service Commission,* 42 Wis. 2d 569, 579, 167 N.W.2d 401, 406 (1969). The rate design filed by Newport in this case, not having been proportionately distributed, is not protected by that mantle of presumed non-discrimination.

In sum, then, no acceptable reason has been advanced by the commission, nor can we conjure any, for requiring the Secretary to prove that the proposed rate design is unjustly discriminatory. Consequently, had the commission bottomed its approval of the rate structure solely upon the Secretary's failure to establish undue discrimination, that approval could

not stand. The commission, however, relied alternatively upon the rationale that Newport's investment in providing services to the Navy is an investment of relatively high risk and that the rate charged for providing that service, although discriminatory, is not unjustly so. That theory, however, even if possessed of a legal basis,[1] has too fragile a factual underpinning to justify its invocation in this case. Indeed, the only reference in the commission's report and order to that underpinning is its statement that there is no guarantee that the Navy will neither abandon its functions in the Newport area, nor curtail planned construction and expansion. But, as the commission then further observed, whether either abandonment or curtailment will in fact occur "remains in the realm of the speculative."[2] A conclusion with no more solid a foundation than speculation cannot be allowed to stand, *Rhode Island Consumers' Council* v. *Smith,* 111 R.I. 271, 277-78, 302 A.2d 757, 762-63 (1973), and where the commission has not referred to the probative evidence that will support its findings, we will not search the record to ascertain if it exists. *Bristol County Water Co.* v. *Public Utilities Commission,* 117 R.I. 89, 99, 363 A.2d 444, 450 (1976).

Accordingly, both because the commission erred in assigning the burden of proof with respect to undue discrimination, and also because the commission's factual basis for the

---

[1]Neither in its report and order nor, in its brief, did the commission cite any authority suggesting that relatively high risk of investment is a basis for allowing a utility to receive a higher rate of return from one customer than from its other classes of customers, and our own research has produced none. It is, however, well established that investment risk is commonly considered in determining a utility's overall rate of return. *Federal Power Comm'n* v. *Hope Natural Gas Co.,* 320 U.S. 591, 605, 64 S. Ct. 281, 289, 88 L. Ed. 333, 346 (1944); *Bluefield Water Works & Improvement Co.* v. *Public Service Comm'n,* 262 U.S. 679, 692, 695, 43 S. Ct. 675, 679, 67 L. Ed. 1176, 1182-83 (1923); *see also* Vonbright, *Principles of Public Utility Rates* at 256-59 (1961).

[2]The Secretary produced evidence showing that there had been a continuous Navy presence in the Newport area since 1869. Although he acknowledged a substantial fleet reduction in 1973, he countered with evidence that the Navy's presence in the area is once again growing, and his assertion in his brief that "no evidence exists to suggest further deterioration in Navy use" is unchallenged.

"relatively high investment risk" theory does not measure up to our standards, the case must be remanded for a further hearing limited to approving a rate structure that is both just and reasonable, and not unjustly discriminatory.[3] In many respects the problems that will arise at that hearing will be "more complex and challenging than the question of fair return." *Payne* v. *Washington Metropolitan Area Transit Commission*, 415 F.2d 901, 914 (D.C. Cir. 1968). Among them will be whether a cost-of-service study is a prerequisite to approving a proposed rate design and, if so, whether the requisite study must fully allocate all the costs of service among all customer classes or merely delineate the cost of serving the Navy.

In attempting to provide the commission with some guidance in this area, we acknowledge the general rule stated by the Supreme Court in *Permian Basin Area Rate Cases*, 390 U.S. 747, 776-777, 88 S. Ct. 1344, 1365, 20 L. Ed. 2d 312, 342 (1968) that

> "rate-making agencies are not bound to the service of any single regulatory formula; they are permitted, unless their statutory authority otherwise plainly indicates, 'to make the pragmatic adjustments which may be called for by particular circumstances,' "

and we bear in mind also that we specifically adopted this principle in *Rhode Island Consumers' Council* v. *Smith*, 111 R.I. at 280, 302 A.2d at 764, where we said that

> "what is important, and indeed decisive, in a rate case,

---

[3]Where material G.L. 1956 (1977 Reenactment) §39-1-1 provides that:

"It is hereby declared to be the policy of the state to provide fair regulation of public utilities and carriers in the interest of the public, to promote availability of adequate, efficient and economical energy, communication, and transportation services and water supplies to the inhabitants of the state, to provide just and reasonable rates and charges for such services and supplies, without unjust discrimination, undue preferences or advantages, or unfair or destructive competitive practices, and to co-operate with other states and agencies of the federal government in promoting and coordinating efforts to achieve realization of this policy."

is not the methods or formulae utilized in the rate-making process, but whether the end result, irrespective of the formula used, is just and reasonable. If it is, and if it is grounded upon substantial legal evidence, then it is not within the judicial province to interfere."

Notwithstanding a regulatory body's freedom to select the controlling formula, it is generally recognized that a cost-of-service study is of paramount importance and may indeed be a precondition to consideration of a proposed rate design, e.g., *Re Pacific Telephone & Telegraph Co.*, 77 P.U.R.3d 1, 18-19 (Cal. P.U.C. 1968); *Re Connecticut Light & Power Co.*, 17 P.U.R. 4th 1, 12 (Conn. P.U.C.A. 1975); *Re Tampa Electric Co.*, 30 P.U.R.3d 286, 287 (Fla. R.R. & P.U.C. 1959); *Re Iowa Power & Light Co.*, 20 P.U.R.4th 397, 417 (Iowa S.C.C. 1977); *Re Southwestern Bell Telephone Co.*, 96 P.U.R.3d 148, 161 (Mo. P.S.C. 1972); *Re Cut Bank Gas Co.*, 12 P.U.R.4th 106, 110 (Mont. P.S.C. 1975); *Re Sierra Pacific Power Co.*, 10 P.U.R.4th 461, 465 (Nev. P.S.C. 1975); *Re Consolidated Edison Co. of New York, Inc.*, 8 P.U.R.4th 475, 478-79 (N.Y.P.S.C. 1975); *In re Green Mountain Power Corp.*, 131 Vt. 284, 305, 305 A.2d 571, 584 (1973); *Re New England Telephone & Telegraph Co.*, 99 P.U.R.3d 309, 312 (Vt. P.S.B. 1973).

Indeed, the rate-making authority in this state acknowledged the importance of such studies in the rate-making process more than 20 years ago in *Re Narragansett Electric Co.*, 21 P.U.R.3d 113, 144-45 (R.I.D.B.R. 1957) where it said that rate simplification should be predicated upon an objective study which will

"provide the division with some means of determining the reasonableness of the rates to be assessed each class of customer. Such a study would necessarily include the determination of the cost of serving the various classes of customers.

"such costs of service studies are [not] the sole basis for setting rates since such studies must be tempered by

judgment. But such studies do provide an objective means for determining whether or not any unreasonable discrimination exists between proposed rates."

More recently the commission in *Re New England Telephone & Telegraph Co.*, No. 1251 (R.I.P.U.C. 1978) said that it would not again accept a filing by the telephone company that was not accompanied by a cost-of-service study.

Moreover, in this case, as already noted, the commission recognized the need for a cost-of-service study, albeit one of limited scope. But a study so limited as the one ordered which relates only to one customer and ignores all others is of "highly questionable" value and is not entitled to "serious consideration." *Re Consolidated Edison Co. of New York, Inc.*, 96 P.U.R. (n.s.) 194, 395 (N.Y.P.S.C. 1952). Of greater value in providing an objective standard for determining whether any unreasonable discrimination exists among the proposed rates is a study that "include[s] the determination of the cost of serving the various classes of customers. *Re Narragansett Electric Co.*, 21 P.U.R.3d at 144. In fact, to determine whether a rate schedule unfairly discriminates requires a comparison among the costs allocated to each of the several customer classes. The absence of that information makes that comparison impossible. *Re New England Telephone & Telegraph Co.*, 99 P.U.R. 3d at 313.

This is not to say, however, that a fully allocated cost-of-service study is the only element to be considered by the commission in determining the propriety of a rate design. Other factors, such as value of service to the community, historical rate design, adequacy of service, environmental considerations, the public benefit and the like, may warrant a departure from or a modification of the rates dictated by cost-of-service. *Payne* v. *Washington Metropolitan Area Transit Commission*, 415 F.2d at 916; *see Re Southern California Gas Co.*, 14 P.U.R.4th 498, 501 (Cal. P.U.C. 1976); *Mountain States Telephone & Telegraph Co.* v. *New Mexico State Corp. Commission*, 19 P.U.R.4th 318, 331 (N.M. Sup. Ct. 1977).

For the reasons indicated the records previously certified to this court are ordered returned to the commission. It should reconsider the evidence and the present record supplemented by such further evidence as may be offered pursuant to the petition of any party or by its own direction and it should make further findings and orders in harmony with this opinion. Pending those findings and orders any increases in rates needed to achieve Newport's overall authorized increase in revenue shall be prorated across-the-board among Newport's several customer classes. Any party dissatisfied with the commission's supplementary findings and orders may, by motion filed with this court within 30 days following the commission's action, bring the matter before us for further consideration. In that event it will be set down for argument upon the briefs now before us and upon such supplemental record and briefs as may be required. Jurisdiction for the review of the commission's supplementary decision and amended order is retained in this court.

*Lincoln C. Almond,* U.S. Attorney, *Everett C. Sammartino, Assistant U.S. Attorney, Barbara Allen Babcock, Rex E. Lee,* Assistant Attorneys General, *Stanley D. Rose, Daniella Sapriel, Gerald D. Freed,* Justice Department Washington D.C., *Frank H. Lewis,* for U.S. Department of Navy, for petitioner.

*Julius C. Michaelson, Attorney General, R. Daniel Prentiss, Special Assistant Attorney General, Sheffield & Harvey, Richard B. Sheffield, Brian G. Bardorf,* for Newport Electric Corporation, for respondent.