**NEW ENGLAND TELEPHONE &
TELEGRAPH COMPANY**

v.

**PUBLIC UTILITIES COMMISSION.**

No. 81–279–M.P.

Supreme Court of Rhode Island.

June 3, 1982.

Reargument Denied June 25, 1982.

Tillinghast, Collins & Graham, Peter J. McGinn, Peter V. Lacouture, Providence Richard W. Blackburn, John F. Natoli, Boston, Mass., for petitioner.

Dennis J. Roberts, II, Atty. Gen., Faith A. LaSalle, Sp. Asst. Atty. Gen., for respondent.

## OPINION

KELLEHER, Justice.

This is a petition for certiorari brought by the New England Telephone & Telegraph Company (NET or the company) pursuant to G.L. 1956 (1977 Reenactment) § 39–5–1 to review the decision and order of the Public Utilities Commission (the commission) issued in docket No. 1560 regarding NET's tariff filing of December 15, 1980. This tariff sought to generate additional annual revenues of $31 million through changes in rates charged for terminal equipment, basic-exchange services, private-line services, and business-customer services. Although the proposed tariff was to be effective January 14, 1981, the commission suspended the filing on January 13, 1981, for a period of five months beyond the proposed effective date as authorized by § 39–3–11, as amended by P.L. 1977, ch. 236, § 2.

During hearings on NET's requested rate increase, the Rhode Island Division of Public Utilities (the division) and the Office of the Attorney General moved to dismiss the tariff or, alternatively, to dismiss proposed rate changes "for which no cognizable cost of service studies have been provided." The Rhode Island Electric Protective Company, Ace Alarm Company, Inc., Guardian Alarm Company, and Sonitrol Security Devices of Providence, Inc. (the private alarm companies) joined in these motions to dismiss the tariff or, alternatively, to dismiss those rate changes applicable to the private alarm companies "for which no cost justification exists." The Rhode Island Consumers' Council also supported the dismissal of NET's filing in its entirety.

The commission heard extensive oral arguments by counsel on the dismissal motions but permitted NET to present all of its evidence in support of the tariff filing. On May 19, 1981, the commission issued its decision and order in which it dismissed the filing insofar as it related to the company's

noncompetitive products and services.[1] The commission concluded that NET had failed to submit an acceptable comprehensive fully allocated cost-of-service study to support its rate proposals for these product and service offerings as mandated by prior decisions and the commission's order in docket No. 1475, *Re New England Telephone & Telegraph Co.*, 39 P.U.R.4th 525 (1980). For reasons not germane to this petition the commission declined to dismiss the tariff filings for the company's competitive product and service lines. By this petition NET seeks to challenge only that portion of the commission's decision concerning the noncompetitive aspects of its service offerings.

## I. THE EVOLVING REGULATORY STANDARD

As has been suggested, the basis for the commission's denial of NET's filing for its monopoly products and services is rooted in a decade of commission decisions beginning in 1970 and culminating in its most recent pronouncements in 1980 regarding NET's general tariff filing in docket No. 1475. The main thrust of the regulatory standard that evolved over this period is the requirement of a thorough cost-of-service study as a proper starting point for determining an appropriate rate design for specific products and services.

According to an expert presented by NET on behalf of its filing, Dr. Frank J. Alessio, American Telephone & Telegraph Company and its wholly owned subsidiaries such as NET historically have relied upon a "relative value-of-service" pricing technique to determine "average category-wide pricing" of products and services. Under this approach the utility determines the value of a given service to a customer class and fixes individual prices accordingly. The costs associated with supplying services play only a minor role in developing rate structures. In time, this pricing methodology came under sharp criticism by regulators and scholars because of the difficulty in objectively evaluating a specific valuation affixed by a

utility to a particular service. As one commentator posited, "How is the company or the regulator to determine the value of a particular service to all customers in a class * * * " when "[b]ecause of the monopolistic nature of the industry, it is impossible to determine the free market price." Lander, *Public Utility Rate Design: The Cost of Service Method of Pricing*, 19 St. Louis U.L.J. 36, 45 (1974); *see also* Bonbright, *Principles of Public Utility Rates*, ch. V at 82 (1961). Lander notes that in light of such criticism and the dramatic upsurge in the number of rate-increase requests filed by the industry to meet rapidly rising inflation, the trend among utility regulatory agencies after 1970 began to shift in favor of more cost-justified pricing for telecommunications services.

The Rhode Island Public Utilities Commission was among the first state regulatory agencies to urge the development of cost-of-service data in this area. Because its decisions throughout the ten-year period from 1970 to 1980 have significant bearing on the rate proceedings we now review, a somewhat lengthy recitation of relevant portions thereof is appropriate.

The commission first expressed its need for cost-of-service calculations over value-of-service judgments in its report and order of January 30, 1970, in docket No. 1024:

"'The commission finds that the practice of disregarding costs is unreasonable and the commission gives notice that it will not long tolerate it. The company should immediately embark upon a program of accurately determining its actual cost of providing service and within the next twelve months present to the commission a proposed revision in rates which will be based upon the actual cost to the company for providing each type of service rather than fixing rates by the "informed judgment" as to the "value of service" as determined on "factors" dictated by AT&T. The company is going to be required to provide the commission

1. Some examples of products and services identified by the commission as noncompetitive are local-exchange service, wide-area-telecommunications service (WATS), call-waiting ser-

vice, touchtone-calling service, foreign-exchange service, jacks, special reversed-charge toll service, and temporary suspension of service.

with actual revenue data, cost data, and plant data for its various services such as Centrex service, supplemental equipment, key telephone service, private-line services, mobile telephone service, residence service connection charges, secretarial line services, and various miscellaneous services.

" 'If this commission is to properly discharge its duties, it must be provided by NET&T with actual revenue, cost and plant data pertaining to each of its tariff offerings. It is within the power of NET&T to supply such data and it is fair and reasonable to require that it be supplied within the next twelve months.' " See Re New England Telephone & Telegraph Co., 39 P.U.R.4th at 530.

More than two years later in docket No. 1092, May 4, 1972, the commission again stressed adherence to the requirement of a cost-of-service study to support NET's tariff filing, noting its consternation at NET's failure to provide such data as of that date:

"The testimony presented in this case makes it apparent that not only can the company produce no figures as to the actual cost of providing the particular service, but in fact, the company refuses to make an effort to determine what its actual costs are for any given service. The record in this case clearly establishes that the company has presented no evidence whatsoever upon which this commission can make a determination of the actual cost of any tariff offering.

" * * *

" * * * Without such actual cost data, it is impossible for this commission to determine whether the proposed rates are in fact fair and reasonable." Re New England Telephone & Telegraph Co., 94 P.U.R.3d 476, 494–95 (1972).

The above ruling was remanded by the court in Rhode Island Consumers' Council v. Smith, 111 R.I. 271, 299–300, 302 A.2d 757, 774 (1973), with directions that the commission clarify the reasons for its conclusion that the value-of-service methodology was unacceptable. In response to the court's directives, the commission held that because there were then no cost studies available, it was constrained to accept NET's rate schedules premised upon the company's traditional pricing methodology. However, NET was firmly admonished to make reasonable efforts to provide such cost information in future rate proceedings:

"While once more, then, we are virtually forced to accept the value of service approach, we again press the company to exert every reasonable effort to produce more detailed cost information for individual services than it has been able to produce to date. It is important that this commission, in evaluating any utility's rate structure, have before it every type of pertinent and relevant evidence which can possibly be made available so that we can be certain that the structure is as reasonable and equitable as it can be. The company will be expected to continue its efforts to develop such costs and to keep the commission informed of its progress on a periodic basis. If this informal approach does not prove to be satisfactory, the commission may at a later date consider undertaking a formal investigation on the subject." Re New England Telephone & Telegraph Co., 99 P.U.R.3d 228, 236 (1973).

With its next general tariff filing in docket No. 1170, Re New England Telephone & Telegraph Co., 10 P.U.R.4th 132, 133–34 (1975), NET provided two cost studies in an attempt to comply with these directives. Of these studies, the commission found the so-called Embedded Direct Cost Study, designed to analyze cost-revenue relationships among several broad service categories, "to be an important and useful first step." NET was strongly urged to continue its efforts to produce more detailed cost data. Two years later, however, the commission felt compelled in docket No. 1251 to rebuke NET for its failure to make any significant progress after the submission of these preliminary studies.

Although dismissal of the tariff filing was advocated by the division on the basis that the proposed rate structure was not predicated upon cost-of-service considerations, the commission concluded that such a

drastic measure would be inappropriate in those proceedings because NET had not received adequate notice of such consequences. However, in its decision of September 4, 1977, the commission issued a stern warning informing NET that future filings not supported by a comprehensive fully allocated cost study would henceforth be rejected.

"By this report and order, however, New England is put on notice that this commission will not approve rates for the company in any future rate case where there is no rate design based upon a cost of service included in the record. That is, while the commission does not bind itself to either accept or reject a cost-based tariff structure, it will insist on the availability of a fully allocated cost study upon which rate design decisions may be made on a more adequate evidentiary record than has been available in the past." *Re New England Telephone & Telegraph Co.*, 22 P.U.R.4th 391, 412 (1977).

Finally, in docket No. 1475, the commission set forth detailed cost-study standards that NET would have to satisfy as a threshold requirement to obtain a rate increase in any subsequent general tariff filing. Consequently, one year later in the proceedings now under review, the several opposing parties sought dismissal of NET's tariff filing because of noncompliance with the dictates of the docket No. 1475 order. Ultimately, the commission determined that NET had failed to supply the requisite cost study to support its filing in accordance with the criteria outlined in that docket.

## II. NET'S ASSIGNMENT OF ERRORS

The company presents a four-pronged challenge to the decision and order: (1) that the commission misinterpreted its own standards enunciated in docket No. 1475 and the evidence submitted met the prescribed criteria set forth in previous commission decisions and orders; (2) that the commission's requirement of a comprehensive fully allocated cost study and rejection of the company's cost-information package was arbitrary and unreasonable; (3) that there is no substantial evidence to support the commis-

sion's finding that circumstances referred to in docket No. 1475 which would permit NET to change its rates without submitting the requisite cost study were not presented; and (4) that the denial of proposed rates for basic-exchange service was arbitrary and capricious.

### A. Standard of Review

■ We reiterate the oft-stated appellate principles that guide our review of the commission's decision and order in this regulatory proceeding. We do not engage in fact-finding or weigh conflicting evidence presented to the commission. *Michaelson v. New England Telephone & Telegraph Co.*, R.I., 404 A.2d 799, 803 (1979); *Blackstone Valley Chamber of Commerce v. Public Utilities Commission*, R.I., 396 A.2d 102, 105 (1979). This court's inquiry is limited to the determination of whether the commission's ruling is lawful and reasonable and whether its findings are fairly and substantially supported by legal evidence. *Valley Gas Co. v. Burke*, R.I., 406 A.2d 366, 369 (1979); *New England Telephone & Telegraph Co. v. Public Utilities Commission*, 118 R.I. 570, 575, 376 A.2d 1041, 1044 (1977); *Rhode Island Consumers' Council v. Smith*, 111 R.I. at 277, 302 A.2d at 762–63.

### B. Compliance with Commission Cost Criteria

In its continuing efforts to obtain the detailed cost information it perceived to be essential to a proper evaluation of the company's rate-increase requests, the commission, in docket No. 1475, spelled out four explicit criteria for an acceptable comprehensive fully allocated cost study:

"First, the study should be comprehensive in that it analyzes all the costs incurred by the company that would be reflected in its aggregate revenue requirement. Second, the study should be fully allocated in that the overhead costs now reflected in an EDA's common cost category would be distributed among various specific services. Third, the study should identify all costs associated with each and every particular service contained in the company's tariffs. And fourth, while the exact format is left to the company, the

study should be organized in a logical and comprehensible manner so that it can be understood by anyone willing to devote a reasonable amount of time and effort * * *." *Re New England Telephone & Telegraph Co.*, 39 P.U.R.4th at 535–36.

The commission also specified five conditions under which a change in rates might be allowed despite NET's failure to present a cost study meeting the above specifications. The exceptions applicable to this case will be discussed *infra.*

The specific cost studies presented by NET in the case at bar consisted of (1) an embedded direct analysis (EDA), (2) a so-called fully allocated cost study (FACS), (3) five specialized studies of specific service areas (multielement service, extension station-line service, semipublic coin-telephone service installation differential, semipublic coin-telephone service differential over single-line measured business service, and local coin-telephone service), and (4) numerous incremental individual cost analyses in the general-service categories of private-line and vertical services. For purposes of our review, the studies concerning the vertical-services category can be disregarded as these services fall on the competitive side of the company's offerings.

NET describes its embedded direct analysis as a study that reviews historical revenue-cost relationships for the provision of telephone services in this state based upon the company books and records. According to Brian R. Lane, NET division manager for the pricing research division, the EDA grouped individual services into the following broad service categories: exchange, toll, vertical, private line, and other.[2] An additional category denominated "common" was also included to indicate additional revenue needs resulting from costs common to all service categories but "not caused by or directly attributable to specific services." Such costs include legal, treasury, and executive expenses. For all but the common category, the analysis showed the costs and revenues associated with each service category for the year 1979.

The broad service categories of exchange and toll were subdivided to provide somewhat more detailed information. The exchange category was disaggregated to reflect revenues and costs according to the general service areas of residence, business, coin, and local directory assistance. The toll category was divided between intrastate and interstate elements of service, and the intrastate element was then further divided to list revenues and costs for the provision of direct-distance-dialed, operator-handled, WATS, and toll directory-assistance services. In total, the 1979 EDA reflected eighteen service lines and the company's aggregate common costs.

The study that NET characterized as a "fully allocated cost study" was derived directly from its 1979 EDA. As noted by Mr. Lane, the only distinction between the EDA and the FACS is that common costs that were listed as a separate category in the EDA were distributed in the FACS among the five broad service categories based on the percentage of investment in each category in relation to the company's total investment in its services. In chart form, the FACS may be illustrated in the following manner:

---

2. In his prefiled testimony Mr. Lane explained the general type of services each of these categories embraces. The exchange category includes usage and network access costs and revenues associated with residence, business, coin, and local directory-assistance services; the toll category refers to costs and revenues for the provision of WATS and message toll services; the vertical category covers competitive product service lines such as key-telephone and private-branch exchange (PBX). As noted, we need not focus upon this category of competitive services in order to resolve the issues raised in NET's petition; the private-line category relates costs and revenues for intraexchange and interexchange private-line telephone service; and, finally, the category labeled as "other" consists principally of revenues and costs associated with directory advertising.

| EXCHANGE | TOLL | VERTICAL | PRIVATE–LINE | OTHER |
|---|---|---|---|---|
| Usage | Interstate | Residence | Interstate | |
| Network access / | Intrastate / | Business | Intrastate | |
| Residence / | Direct-distance-dialed / | | | |
| Business / | Operator-handled / | | | |
| Coin / | WATS / | | | |
| Local directory-assistance | Toll directory-assistance | | | |

Judging the evidence in the light most favorable to the company, the commission concluded that the cost information supplied by NET in its EDA and FACS failed to conform to the four criteria expressed in docket No. 1475, specifically criteria 2 and 3. Citing the studies' deficiencies, the commission stated:

"While Chart B [the FACS] does distribute the overhead costs otherwise reflected in the EDA's Common Cost category, it distributes those costs only among the EDA's broad categories of service rather than 'among various specific services.' And with regard to the third criterion that 'the study should identify all costs associated with each and every particular service contained in the Company's tariffs,' both Charts A [the EDA] and B are patently inadequate in that they analyze only broad categories of service."

The commission emphasized that in contrast to the broad-category format of these studies, NET's tariff listed rates for hundreds and perhaps thousands of specific service and product lines for which it sought the commission's approval. Therefore, NET's so-called FACS was determined to be unacceptable because it was "not possible to identify which portion of the cost for each broad category is associated with each and every particular service contained within the category."

NET argues that its EDA and FACS satisfy the requirements set forth in docket No. 1475 in that the assignment of costs according to the level of services to which these studies were disaggregated is all that was mandated. It contends that the commission misinterpreted the standards articulated in its previous decision and order and applied an entirely new standard in these proceedings calling for a fully allocated cost study broken down "for each and every one of the hundreds of products and services in the Company's tariff." Such an unanticipated departure from the regulatory standards operative at the time of the docket No. 1560 hearings, NET asserts, not only constitutes arbitrary and capricious agency action but also runs counter to due-process norms governing rulemaking by adjudication.

Although the zeal of the company's counsel is commendable, we submit that it is NET that has misinterpreted the meaning of the cost specifications delineated in docket No. 1475. NET's interpretation requires the incorporation of language limiting the focus of these standards to broad service categories or general-customer classes of services offered by the company. A reading of the docket No. 1475 criteria as well as statements contained in prior commission decisions evinces no support for the engraftment of such textual limitations.

In its decision in docket No. 1024, for instance, the commission referred to revenue and cost data of the company's "various services," listing as examples its centrex, supplemental-equipment, key-telephone, private-line, mobile-telephone, residence-connection, and secretarial-line services.

*See Re New England Telephone & Telegraph Co.*, 39 P.U.R.4th at 529–30. These examples certainly transcend the broad service categories contained in the FACS. Further, in the decision in docket No. 1092, *Re New England Telephone & Telegraph Co.*, 99 P.U.R.3d at 236, the commission spoke in terms of "detailed cost information for *individual services*." (Emphasis added.)

 It is our opinion that the reasonable import of the commission's statement that a proper comprehensive cost study " 'identify all costs associated with each and every particular service contained in the company's tariffs,' " is that such cost information must be disaggregated to that level which corresponds with the level to which NET's proposed rates are disaggregated. An example will perhaps best highlight the difficulties with the construction NET advances and the reasons we uphold the commission's determination that the company has not satisfied its requirement. The cost-revenue relationships provided in the FACS for the private-line-service category have been disaggregated only to the next major subdivision within that category, the interstate and intrastate aspects of the service. In the tariff filing, however, private-line-service is classified by channel series, which in turn are further classified by specific channel types.[3] Four such series are listed—series 1000 channels, series 2000 channels, series 3000 channels, and series 6000 channels. Numerous different channel types were also listed. In striking contrast to its FACS, the various rates NET proposed in its tariff for the private-line-service category are disaggregated according to both channel series and type.

### C. Requirement of a Fully Allocated Cost Study

Arguing in the alternative, NET contends that even if it has not complied with the requisite cost standards, the decision and order under review is nevertheless reversible because the requirement of a comprehensive fully allocated cost study exceeds the statutory authority conferred upon the commission and is wholly unreasonable.[4]

The commission is charged with the duty and exclusive authority to supervise, regulate, and promulgate orders governing public utilities to ensure, *inter alia*, that rates and charges assessed the public for the provision of utility services are not improper, unreasonable, or unjustly discriminatory. *See* G.L. 1956 (1977 Reenactment) § 39–1–1. To this end, the Legislature has vested in the commission "all additional, implied and incidental power which may be proper or necessary to effectuate their purposes." Section 39–1–38. Additionally, our statutory scheme expressly imposes the burden of proof upon a utility proposing a rate increase to demonstrate, with respect to every component of its tariff, that the increase sought is necessary to achieve a reasonable compensation for services rendered. *See Valley Gas Co. v. Burke*, 406 A.2d at 370; § 39–3–12.

 To satisfy this burden, a utility must prove that the overall revenue increase requested is necessary and that the schedule of rates it proposes is nondiscriminatory.

---

3. The company defines a "channel" as an "electrical path furnished by the Telephone Company between two or more points, suitable for the purpose furnished and derived in such manner as the Telephone Company may elect."

4. The company did not appeal the decision and order in docket No. 1475 to contest the cost-information requirements imposed upon it with respect to all future rate-increase filings. Hence, the appropriateness of this all-inclusive challenge at this juncture in the ten-year period of regulatory interaction between the commission and NET is questionable. When a utility chooses not to seek appellate review of an order imposing some obligation upon it, ordinarily the utility is bound to comply with the terms of that order before it can expect action on any proposed tariffs. *See Bristol and Warren Gas Co. v. Harsch*, 119 R.I. 807, 812, 384 A.2d 298, 300 (1978). Moreover, the unappealed order generally cannot be contested in some future proceeding. *See Dept. of Environmental Resources v. Wheeling-Pittsburgh Steel Corp.*, 473 Pa. 432, 375 A.2d 320, *cert. denied*, 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977). However, we recognize that the implications of our decision for future rate proceedings are significant, and therefore, we think it prudent to address the issues raised on the merits.

*Blackstone Valley Chamber of Commerce v. Public Utilities Commission,* 396 A.2d at 104; *United States v. Public Utilities Commission,* 120 R.I. 959, 963, 393 A.2d 1092, 1094 (1978). Should the utility seek to spread the increase proportionately across the board among its several customer classes, it may rely upon a presumption that the new rates proposed are reasonable and nondiscriminatory since they are superimposed upon existing rates previously approved by the commission. *Id.* at 964, 393 A.2d at 1095.

■ In the instant regulatory proceedings counsel for NET noted that the tariff filing proposed increases of 13 percent for residence-exchange service, 14 percent for business-exchange service, 35 to 50 percent for key-telephone service, 34 to 70 percent for semipublic coin-telephone service, 85 percent for private-line service, and 45 percent for auxiliary service. The commission correctly observed, therefore, that because NET sought increases of varying percentages for its "several customer groups," or multiservices, the proposed tariff-rate schedules were "not protected by the mantle of presumed nondiscrimination."

■ In view of the statutory framework described, we have no doubt but that the commission is fully empowered to prescribe as a threshold requirement the precise cost information that a utility such as NET must submit with its rate-increase filings in order to meet its statutory burden to prove that the requested overall revenue is necessary and the proposed rate design nondiscriminatory. We also point out that this very principle can be discerned from the court's previous rulings in *United States v. Public Utilities Commission* and *Michaelson v. New England Telephone & Telegraph Co.,* both *supra.*

In the former case, the Navy objected to its being charged increased rates for the provision of electricity different from the rates charged the utility's other customer classes. The court commented that "it is generally recognized that a cost-of-service study is of paramount importance and may indeed be a precondition to consideration of a proposed rate design." [Citations omit-

ted.] *United States v. Public Utilities Commission,* 120 R.I. at 967, 393 A.2d at 1096. The case was remanded to the commission for its determination of whether, under the particular circumstances presented, a cost-of-service study was a prerequisite to approving the proposed rate design under review, and if so, "whether the requisite study must fully allocate all costs of service among all customer classes or merely delineate the cost of serving the Navy." *Id.* at 966, 393 A.2d at 1096.

In the latter case the commission declined to dismiss NET's tariff filing for failure to base its rate design upon cost-of-service considerations, reasoning that such action would represent " 'a major change in the governing regulatory standard for which "there should ordinarily be warning sufficient to adjust both the practice and proof to the new situation." ' " *Michaelson v. New England Telephone & Telegraph Co.,* 404 A.2d at 813. The court upheld the commission's limitation of its cost-information standards to all subsequent rate proceedings in the absence of any showing that the company had *at that time* failed to produce the type of evidence which the commission had accepted, albeit reluctantly, in the past. The court concluded,

"This controversy does not require us to decide specifically whether a cost-of-service study is a prerequisite to the commission's approval of a tariff filing. We reach that conclusion because, even *assuming* both that a cost-of-service study is necessary and that the company did not meet its burden to produce the cost data, we feel that the commission could legitimately delay requiring the data if it believed that without that delay the company could not compile the information." (Footnote omitted.) *Id.* 404 A.2d at 813.

We turn now to the company's charge that the commission was unreasonable in its strict adherence to the cost-study standards outlined in docket No. 1475. NET takes the position that the interdependent cost-information materials accompanying its filing, consisting of the 1979 EDA, the FACS, the five specialized service-area studies, and the

numerous incremental unit-cost analyses, afforded the commission all the data necessary to evaluate the reasonableness of the proposed individual rates. It claims, therefore, that it was arbitrary and capricious for the commission to reject the individual economic analyses submitted simply because of NET's failure to meet the threshold requirement of a sufficiently detailed fully allocated cost study.

Again, we emphasize that it is entirely within the province and expertise of the commission to determine the nature and type of factual information that must be supplied in the first instance by a utility, unless shown to be impossible or unduly burdensome, in order to obtain approval of a tariff-increase request. *See American Can Co. v. Davis*, 28 Or.App. 207, 559 P.2d 898 (1977) (determination of nature and type of facts likely to assist regulatory agency in discharging its duties is for public utility commissioner to make, and commissioner may order such studies as he deems relevant although he is not required to have any particular study or investigation made); *see also Trustees of Clark University v. Department of Public Utilities*, 372 Mass. 331, 361 N.E.2d 1285 (1977) (utility's rates need not be structured on a cost-related basis unless, after fair warning, the department of public utilities requires that approach). Furthermore, the commission did not, as NET suggests, reject wholesale the individual service studies presented; it merely held that such analyses were not acceptable substitutes for the comprehensive fully allocated cost study dictated by its prior decisions. The commission found that these unit-cost analyses fell short of its cost standards because they were "partial."

In this regard the studies suffered from the same deficiency that had tainted similar individual cost studies accompanying the filing in docket No. 1475. Quoting from its earlier decision in that docket, the commission explained:

" 'The Company cannot meet this burden [to establish that proposed rates are nondiscriminatory] simply by submitting the costs associated with individual tariffs, but must also provide comprehensive cost information for *all tariffs*; to re-

quire less would be to improperly shift to unhappy ratepayers the burden of proving that the proposed tariffs were discriminatory. Under a piecemeal approach a utility could select which rates to study, ignore studies once completed, eventually attain certain revenue goals bit by bit, and delay indefinitely the submittal of a fully allocated cost study.' " (Emphasis added.)

Nor do we share the company's opinion that the commission is unreasonably relying upon a cost-of-service criterion as the determinative basis for setting specific rates for the multifaceted offerings contained in the tariff. On the contrary, a review of the decision reveals that the commission was fully cognizant that various factors have a bearing on the final pricing decision, only one of which is the actual cost of rendering a particular service or product. It simply concluded that to consider all such relevant factors properly, it must have before it the "complete picture." Reiterating its position as expressed in an earlier decision and reaffirmed in its decision in docket No. 1475, it stated:

" '[W]hile the Commission does not bind itself to either accept or reject a cost-based tariff structure, it will insist on the availability of a fully allocated cost study upon which rate design decisions may be made on a more adequate evidentiary record than has been available in the past.' "

In the eyes of the commission, then, the lack of a comprehensive fully allocated cost study in docket No. 1560 rendered the "picture" unacceptably incomplete. It is interesting to note, as the commission points out, two of its regional counterparts, the Maine Public Utilities Commission and the Massachusetts Department of Public Utilities, have rejected NET's cost studies submitted in recent rate proceedings. Both agencies characterized the company's 1979 EDA as seriously deficient and unacceptable as a basis by which its tariff proposals could be supported. *See* Me. P.U.C. Decision and Order in Docket No. 80–142 at 75, (March 30, 1981), and Mass. D.P.U. Decision and

Order in Docket No. 411 at 59–61 (April 3, 1981).

Finally, we remain unpersuaded by NET's citation to the ruling in *Mountain States Telephone & Telegraph Co. v. New Mexico State Corp. Commission*, 90 N.M. 325, 563 P.2d 588 (1977), in which the New Mexico Supreme Court reversed the order of the state regulatory agency denying the utility's rate-increase request for lack of sufficient cost data to support each and every proposed rate. The order in that case significantly differs from the order before us in two vital respects. First, relying on the cost information accompanying the filing, the New Mexico commission was able to determine the exact additional yearly revenue needs of the utility and did in fact do so. According to the court, this was "the most critical part of the decision-making process; from there it simply became a question of how the increased revenue load was to be apportioned among the customers of Mountain Bell." *Id.* at 332, 563 P.2d at 595. Second, the commission had not previously indicated that it desired additional proof to support the rate schedules. Having rejected the proposed allocation of the additional revenues found to be necessary, the court concluded that under the mandates of the New Mexico Constitution the commission was obligated to promulgate alternative rate schedules since, in the court's opinion, substantial cost information had been presented from which fair and reasonable rates could have been calculated. *Id.* at 333, 563 P.2d at 596.

█ In the case at bar, no finding was made concerning the additional aggregate revenue needs of NET. Indeed, the very heart of the controversy revolves around the commission's position that a threshold requirement for any determination of NET's increased revenue needs is the presentation of a comprehensive fully allocated cost study identifying "all costs associated with each and every particular service" listed in the company's tariff. Nor can it be seriously maintained that the record before us is devoid of any complaints by the commission regarding NET's failure to provide it with more adequate and detailed cost information to support both the filing in question and previous filings. Whatever may be the burden imposed upon a New Mexico utility seeking to increase its rates, we again stress that our statutory scheme places upon a Rhode Island utility the burden of proving both its overall revenue needs and the reasonableness of its rates. Moreover, no affirmative duty is imposed upon the commission to fix such rates when the utility has not demonstrated that its new rate schedule is reasonable and not unjustly discriminatory.

### D. Exceptions

The cost standards set forth in docket No. 1475 were not intended by the commission to be applied rigidly. Rather, the commission appears to have been sensitive to the complexity of telecommunications ratemaking and the difficulties confronting the company in developing the comprehensive study mandated. To provide flexibility and ensure fairness to NET, five circumstances were cited under which the company could obtain approval of its filing in whole or in part despite the lack of a fully allocated cost study should any one of them be applicable. These exceptions were noted in the docket No. 1560 decision as: (1) lack of "warning sufficient to adjust both the practice and proof to any major change in a governing regulatory standard," (2) good-faith effort falling short of compliance with the standards, (3) impossibility of producing the required analysis, (4) negligible impact of the proposed rate changes "compared to NET's overall intrastate Rhode Island revenues," and (5) rate changes proposed for competitive products and services "as long as the Company continues to prove net positive contributions" to overall revenues.

█ NET attacks the commission's finding that the absence of the requisite cost study was not excused by reason of the good-faith effort, impossibility, or negligible-revenue impact exceptions. At the outset it should be understood that this court will not disturb this finding unless the record establishes that it is not fairly and substantially supported by legal evidence. We cannot substitute our independent judg-

ment for that of the commission. *Narragansett Electric Co. v. Burke*, R.I., 404 A.2d 821, 826 (1979), *cert. denied*, 444 U.S. 1079, 100 S.Ct. 1031, 62 L.Ed.2d 763 (1980); *Michaelson v. New England Telephone & Telegraph Co.*, 404 A.2d at 803.

■ Focusing first upon the good-faith element, the commission stated,

"Given the long line of cases in which we have clearly requested NET to provide adequate cost information, we cannot conclude from this record that the Company made an effort to comply that is reasonably commensurate with its resources and expertise."

This conclusion was reached after the commission reviewed the company's cost-information package and determined that it represented at best only a marginal improvement over the cost information presented previously in docket No. 1475 in that it consisted essentially of individual studies plus the company's EDA with allocation of the common costs according to a simple investment formula. By way of comparison, the commission noted that it had afforded the Newport Electric Corporation the advantage of this exception when its cost-of-service study was found unacceptable because it was grounded upon unsupported data from other electric utilities but had, at least, been fully allocated and disaggregated to the level of individual tariffs and various customer classes in a good-faith effort to develop the type of cost study the commission sought. *See Re Newport Electric Corp.*, 34 P.U.R.4th 526, 544–46 (1980).

The company attempts to rebut this finding by referring to the "volume" of work papers filed with its tariff as evidence that it provided the commission with the "most comprehensive cost evidence ever presented by the Company to any regulatory body in New England." This self-laudatory citation does nothing to advance NET's argument; the focus of the inquiry is not the magnitude of the individual work papers submitted but the nature and quality of the cost evidence. We find no merit to NET's claim that its so-called FACS represents a genuine good-faith effort to produce a cost study conforming to these criteria, given, as

NET would have it, the ambiguity with which the criteria are imbued and the wholly unanticipated interpretation attributed to them by the commission. For reasons already discussed, we do not regard these cost standards ambiguous, nor do we believe the commission's interpretation thereof to be a marked and unexpected departure from its prior pronouncements. Further, the commission noted that at no time had NET requested clarification or reconsideration of these standards.

As for the individual incremental studies submitted, in all fairness to NET it would appear that at least the local coin-service and semipublic coin-telephone-service analyses were produced in response to the commission's criticism in docket No. 1475 of the lack of even minimal cost data to justify the rates proposed for these services. *See Re New England Telephone & Telegraph Co.*, 39 P.U.R.4th at 544–45. Notwithstanding these analyses, as well as the other unit-cost studies, we see no basis for disturbing the commission's finding in view of its admonishment in docket No. 1475 that the requirement of a comprehensive fully allocated cost study cannot be circumvented by the submission of individual cost studies, no matter the number. *Id.* at 538. Without belaboring the point, we also note that in docket No. 1475 the charges proposed for multielement service and extension station-line service, for which NET had submitted individual cost studies not unlike those submitted in the proceedings under review, were not permitted to become effective until NET furnished the requisite comprehensive fully allocated cost-of-service study to establish that these rates were not discriminatory. *Id.* at 538–39.

■ Similarly, we find no basis for disturbing the commission's determination that there was no "evidence to support a conclusion that the required comprehensive fully allocated cost of service study cannot be conducted." On the company's behalf, Dr. Alessio explained that the EDA is designed to "check to the books of the company," which in turn are maintained in accordance with the Uniform System of Accounts as dictated by Federal Communi-

cations Commission (FCC) regulations. It was his opinion that it would not be possible to check the EDA against company books if the broad service categories currently listed were subdivided to show cost-revenue relationships for specific products and services because the FCC accounting method provides such information only for broad service categories. To supply such data at the level of disaggregation the commission desired, he stated, a more functional accounting system would be necessary.

■ Doctor Alessio, however, conceded that NET is in no way prohibited by the FCC from developing a more detailed breakdown of its current accounts. Likewise, the commission is not bound by the company's account books for rate-setting purposes. *Washington Public Interest Organization v. Public Service Commission*, 393 A.2d 71, 80–82 (D.C.App.1978); *New England Telephone & Telegraph Co. v. Public Utilities Commission*, 390 A.2d 8, 23 (Me. 1978). Moreover, according to Dr. Alessio, NET had long recognized the desirability of a more functional accounting method and had moved in this direction by the somewhat further subdivision within the broad EDA categories. He not only agreed that it was possible for NET to develop a more functional accounting method but also encouraged continued efforts on NET's part in this regard.

■ Finally, in response to a question concerning NET's ability to develop the type of disaggregated accounting records the commission sought, Dr. Alessio expressed concern for the "practical difficulties" involved but admitted that he was not sufficiently familiar "with all of the ways in which the uniform system of accounts are put together to be able to answer that question." Parenthetically, we note that NET's failure to thus far develop the requi-

site cost data was attributed by the commission not to reasons of impracticability, but rather to the company's devotion of considerable energy to design and implement incremental analyses to be used for marketing purposes. These studies, however, were found not particularly useful for the commission's purposes because of incompatibility with the embedded (historical) cost focus of the company's books of accounts.

■ Lastly, with respect to the negligible-revenue impact exception, we think NET's complaint legitimate. The application of this exception in docket No. 1475 entailed scrutinizing each of the various service offerings in the company's filing to ascertain whether or not the increased revenue to be generated by the charges proposed for a particular service was negligible in comparison to the aggregate revenues that would be received from all the rate schedules listed in the filing. For instance, revised tariffs for operator-handled calls, certain measured residence services, measured business service, and message-toll service were approved because, in the commission's opinion, the revenue impact of the charges for these services was negligible when compared to the overall revenue increase requested, thereby making it highly unlikely that a fully allocated cost study would prove these rate schedules discriminatory. *Re New England Telephone & Telegraph Co.*, 39 P.U.R.4th at 540–41.

NET contends that notwithstanding the negligible-revenue exemption, the commission denied its temporary-suspension-of-residential-service proposal which would have had no revenue impact;[5] the rate schedule for listing services which would have resulted in a revenue impact of only $400,000; and the rate schedule for semipublic telephone service which would have resulted in a revenue impact of only $300,000.[6] It ap-

---

5. Under the company's current tariff filing, residential customers whose services are temporarily suspended are charged 50 percent of their normal service rate. NET proposed, instead, to charge such customers a flat monthly rate for this service.

6. Listing services essentially relate to publication of customer numbers in the white pages of

telephone directories and to private nondirectory listings. Semipublic telephone service is a class of basic-exchange service designed for the combined use of a business customer and the general public. It differs from basic business service in that the customer's phone is additionally equipped with a coin-collecting device.

pears that without explanation the commission applied this exception in the instant proceedings in an entirely new manner. No attempt was made to evaluate the revenue effect of rate proposals for specific services in relation to the total additional revenues NET hoped to obtain from its entire tariff filing. Instead, the commission simply referred to the fact that the aggregate increase proposed was approximately $31 million and, therefore, concluded that the exception was inapplicable as the overall increase requested "could hardly be less *de minimis.*" In effect, the commission redefined the exemption in these proceedings without affording NET notice and without offering any rationale. In so doing, the commission acted arbitrarily and capriciously.

 Throughout the course of its dealings with NET, the commission has operated under its own articulated policy that whenever there is a major change in a governing regulatory standard, "there should ordinarily be warning sufficient to adjust both the practice and proof to the new situation." *Re New England Telephone & Telegraph Co.*, 39 P.U.R.4th at 533. We commend the commission for adopting such a policy and are aware of no sound reasons to justify the sudden retreat therefrom in the docket No. 1560 proceedings. *See Boston Edison Co. v. Federal Power Commission*, 557 F.2d 845, 848–49 (D.C.Cir.), *cert. denied*, 434 U.S. 956, 98 S.Ct. 482, 54 L.Ed.2d 314 (1977) (when administrative agency reverses course from its precedents, it must give notice that standard is being changed). Furthermore, although the commission is free to alter past standards and practices, it must provide an explanation for such departures. As aptly stated by the United States Court of Appeals for the District of Columbia in *Greater Boston Television Corp. v. Federal Communications Commission*, 444 F.2d 841, 852 (D.C.Cir. 1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971):

> "[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion

it may cross the line from the tolerably terse to the intolerably mute." (Footnotes omitted.)

*Accord Hatch v. Federal Energy Regulatory Commission*, 654 F.2d 825 (D.C.Cir. 1981); *Ohio Fast Freight, Inc. v. United States*, 574 F.2d 316 (6th Cir. 1978); *see also Atchison, Topeka & Santa Fe Railway Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 806–08, 93 S.Ct. 2367, 2374–75, 37 L.Ed.2d 350, 361–63 (1973).

### E. Basic-Exchange Service

The final issue in this controversy concerns the denial of NET's request to increase charges for basic-exchange service by approximately $6.9 million. Unlike the approach taken with other service offerings, the commission has continually endorsed NET's use of a residual pricing methodology based upon value-of-service concepts for designing basic-exchange-service rates. For public-policy reasons this service has been priced independently of costs so as to promote the greatest degree of network access feasible. The general principle underlying the rate structure is that exchange-service rates should increase as the number of telephone customers in a particular local exchange-service area can call on a toll-free basis increases.

NET's proposal to increase monthly rates for local residential-exchange service by 13 percent was dismissed for failure to provide the requisite cost study indicating the average cost of that service for exchanges of various sizes. Doctor Alessio testified that an incremental cost study was not performed for this service category because of the residual pricing policy that results in these services being priced considerably below cost. He estimated that if such a study were to be conducted, it would show that the price of basic residential-exchange service is significantly below one-half of its incremental cost. In his opinion, therefore, valuable company resources would merely be wasted by carrying out a cost study that he believed would have no effect on the actual pricing decision. We are constrained to agree.

The commission responded to Dr. Alessio's assertion by relying on its previous statement in docket No. 1475 that

" '[W]hile the Commission does not bind itself to either accept or reject a cost-based tariff structure, it will insist on the availability of a fully allocated cost study upon which rate design decisions may be made on a more adequate evidentiary record than has been available in the past.' "

This comment completely ignores other remarks in docket No. 1475 indicating the commission's acceptance of NET's value-of-service rationale to support its exchange-rate-group structure over a cost-of-service approach. The commission explicitly stated, "[W]e require no cost study." To obtain approval of its group reclassification proposal, NET was only required to demonstrate by some objective means the actual value of the service. To this end it was directed to conduct a study to ascertain the average number of calls per subscriber in each rate group. It was anticipated that a comparison of the number of calls with the size of the rate groups would reflect the actual value a subscriber derived from the service. *Re New England Telephone & Telegraph Co.*, 39 P.U.R.4th at 541–42. Further, the commission's reasoning in docket No. 1560 makes even less sense in light of its decision of April 1, 1981 in docket No. 1522 following NET's submission of this rate-group-subscriber study. The commission announced:

"We are persuaded that basic exchange rates based on actual costs incurred would be likely to introduce disparities due to geographical exchange boundaries and central office equipment. These are factors over which the customer has no control and which might well appear to be more arbitrary and inequitable than the present system.
" * * *

"[T]he data generally shows that as the size of the Local Service Area increases, the average number of calls customers make within the Local Service Area increases.
" * * *

"For this reason, together with the fact that the reclassification tariff is cost-based, we conclude that a comprehensive fully allocated cost of service study is not a prerequisite to the operation of the tariff."

Even though the commission also indicated, in the most general terms, that the rate design for this service would continue to be reviewed as circumstances changed, nowhere in the decision did it caution the company that a comprehensive fully allocated cost study would be required in future proceedings before approval of local exchange-service rates would be given. The company's FACS submitted in these proceedings indicates that the overall cost of residential basic-exchange service exceeds revenues by some $32 million. In view of its request to decrease this revenue shortfall by slightly less than $7 million, we believe that the denial *in toto* of any increase for this service category for lack of such study was arbitrary and unreasonable.

### III. CONCLUSION

The company's petition for certiorari, insofar as it relates to the commission's rejection of the company's cost evidence for failure to satisfy cost standards prescribed in prior commission decisions and orders and its finding that the absence of the requisite cost study was not excused by reason of good-faith efforts or impossibility, is denied and dismissed. The petition as it relates to the denial of the company's temporary-suspension-of-service proposal and the revised rate schedules for listing services, semipublic telephone service and residential basic-exchange service is granted, and those portions of the commission's decision and order are quashed. The records certified to this court are remanded with instructions that the commission make further findings, consistent with this opinion, in regard to the appropriateness of granting the tariffs proposed for these services. Any party dissatisfied with the commission's supplementary orders may, by a motion filed in this court within twenty days following the commission's action, bring the matter before us for further review.