UNITED STATES of America

v.

PUBLIC UTILITIES COMMISSION
OF the STATE OF RHODE
ISLAND et al.

No. 92–516–M.P.

Supreme Court of Rhode Island.

Dec. 24, 1993.

Everett C. Sammartino, U.S. Atty., Audrey Vandyke, Washington, DC, for plaintiff.

Paul J. Roberti, Sp. Asst. Atty. Gen., Julio Mazzoli, Asst. Atty. Gen., Peter McGinn, Joanne Conte, Tillinghast, Collins & Graham, Providence, Daniel Schatz, Dept. of Business Regulations, Hugo Ricci, Ricci & Ricci, Providence, Paul Ivaska, Boston, MA, for defendant.

## OPINION

SHEA, Justice.

This case came before the Supreme Court upon the granting of the petition of the Department of the Navy (Navy) for a writ of certiorari under G.L.1956 (1990 Reenactment) § 39–5–1 to review a report and order of the Rhode Island Public Utilities Commission (the commission) in docket No. 2036. The granting of the petition was without prejudice to the parties raising the issue of the timeliness of the Navy's petition. We summarize the pertinent facts as follows.

On December 27, 1991, the Newport Electric Corporation (the company), a public utility subject to the provisions of G.L.1956 (1990 Reenactment) title 39, filed two applications for rate relief with accompanying rate schedules with the commission. The proposed rate schedule was designed to collect additional revenues in the amount of $7,343,531 or an increase of 13.6 percent.

The first phase (phase 1) was to become effective January 27, 1992. The proposed change consisted of the normal increase in cost of service and totaled $6,093,664, an increase of approximately 11 percent. The second phase (phase 2) was to become effec-

tive January 1, 1993. Phase 2 consisted of $1,249,867, a 2.6 percent increase, and pertained only to the impact of the Financial Accounting Standards Board Statement.[1]

Pursuant to § 39-3-11, the commission suspended the effective date, of the phase 1 rate increase until June 26, 1992. In the meantime three parties, the Navy, the Energy Council of Rhode Island (TEC-RI), and the Rhode Island Department of Economic Development (DED), individually filed motions with the commission to intervene in the rate proceedings. All three motions were timely and were granted. On June 16, 1992, the commission again issued an order suspending the phase 1 implementation for three months to September 26, 1992, with a report to issue on the next business day, September 28, 1992.

The company is a wholly owned subsidiary of Eastern Utilities Associates. The company serves approximately 31,000 customers, of which approximately 27,000 are residential. Its largest customer is the Navy, which takes approximately 20 percent of its load. The service area covers fifty-five square miles, providing electrical service to Aquidneck, Conanicut, and Prudence Islands which includes the city of Newport and the towns of Middletown, Portsmouth, and Jamestown. The company generates its own power obtained from a jointly owned facility and purchases power, either directly or indirectly, from supply contracts with other New England utilities.

Hearings on the proposed rate change began in April of 1992 and extended through May of that year, where all the parties including the intervenors had opportunity to present testimony. Three separate stipulations that together addressed all aspects of the company's filing, were entered into by the various parties. The first stipulation (stipulation 1) pertained to the company's revenue requirements and was agreed to by the company, the Division of Public Utilities and Carriers and the Attorney General of Rhode Island (collectively the division), and the Navy on May 18, 1992. It provided that "Newport's Phase I rates shall be revised to

increase annual revenues by $3,660,000, and an increase of 6.6%." Stipulation 1 was a modification of the original revenue sought, $6,093,664.

The second stipulation (stipulation 2) pertained to rate class revenue requirements. The third stipulation (stipulation 3) pertained to rate design. Both stipulation 2 and stipulation 3 were agreed to by the company, the division, and TEC-RI on May 29, 1992. The Navy refused to enter either of these two stipulations. The DED did not enter into any of the three stipulations. Public hearings were continued in June to consider the various issues surrounding the proposed increase. Briefs were filed by the parties and reviewed by the commission. The commission reopened hearings on September 8, 1992, to consider additional issues. Finally on September 28, 1992, as scheduled, the commission released its report and order approving phase 1 of the rate increase.

The commission ultimately accepted the three separate stipulations in its report and order. Stipulation 1 is not being contested in this case. The Navy is not challenging the company's entitlement to additional revenue but rather the increased rates imposed on it in order to achieve that additional revenue. Stipulation 2 and stipulation 3, neither of which the Navy entered as a party, were intended to resolve matters relating to rate class and rate design. The Navy argues that the commission's acceptance of these stipulations was unfair, unlawful, and discriminatory.

The Navy is seeking our review on three issues, one procedural and two substantive. The procedural issue, which, we shall address first, is whether the Navy is entitled to the issuance of a common-law writ of certiorari. The second issue relates to the propriety of the rate increase imposed on the Navy in phase 1. The third issue pertains to the commission's modifications to the contract between the Navy and the company in the redesigned Navy rate.

We conclude that the Navy is entitled to the issuance of a common-law writ of certio-

---

1. Phase 2 is being considered by the commission in a separate docket proceeding, docket No.

2045. We will address only the issues surrounding the phase 1 increase in this opinion.

rari because of the commission's highly inappropriate interference in the contract between the Navy and the company. We agree to review the entire case for that extraordinary reason alone.

## I

Judicial review of decisions and orders of the commission are governed by § 39–5–1. The relevant portions of that statute provide:

"Any person aggrieved by a decision or order of the commission may, within seven (7) days from the date of the decision or order, petition the supreme court for a writ of certiorari to review the legality and reasonableness of the decision or order. * * * The procedure established by this chapter shall constitute the exclusive remedy for persons and companies aggrieved by any order or judgment of the commission."

■ We have held that a failure to petition for a writ of certiorari within seven days of the date of the order, as required by § 39–5–1 renders the findings of the commission nonreviewable. *Interstate Navigation Co. v. Burke*, 465 A.2d 750, 755 (R.I.1983). The period for filing a statutory petition for certiorari under § 39–5–1 cannot be extended.

This court, however, "has exclusive jurisdiction to issue a common-law writ of certiorari on occasions in which available remedies are inadequate to safeguard a litigant from substantial harm or injustice." *Ratcliffe v. Coastal Resources Management Council*, 584 A.2d 1107, 1110 (R.I.1991). The Navy argues that this case presents one of those occasions in which common-law certiorari is appropriate.

The circumstances in which this court will grant a common-law petition for certiorari are set forth in *Barletta v. Kilvert*, 111 R.I. 485, 304 A.2d 353 (1973):

"Under our cases certiorari does not ordinarily lie where another adequate remedy is available whereby the applicant's rights can be reviewed and determined by this court, nor where the petition seeks a review of an interlocutory order nor where to grant certiorari will result in bringing a matter before us in piecemeal fashion.

This is the rule which has been followed in this state for many years, except where it is shown that unusual hardship or exceptional circumstances would void the benefits of an otherwise adequate remedy at law." *Id.* at 487, 304 A.2d at 354–55 (citing *Shiller & Schwerin v. Gemma*, 106 R.I. 163, 256 A.2d 487 (1969); *Rogers v. Rogers*, 98 R.I. 263, 201 A.2d 140 (1964)).

In *Eastern Communications Corp. v. Burman*, 121 R.I. 311, 397 A.2d 1317 (1979), we determined that § 39–5–1 presents an adequate remedy at law under the standards pronounced in *Barletta v. Kilvert* for review of commission decisions and orders. *Burman*, 121 R.I. at 315, 397 A.2d at 1319. Although we stated in *Burman* that failure to receive notice of a commission order may "[render] inadequate the otherwise adequate remedy provided by § 39–5–1," the Navy, in this case, has not claimed that it did not receive notice of the issuance of the report and order. *Id.* Instead the Navy argues that it did not receive a copy of the report and order until after the appeal period had expired.

■ It is undisputed that the Navy failed to file its petition for a writ of certiorari within seven days of the September 28 report and order. The Navy argues that it did not receive the report and order until after the seven-day appeal period had expired and that it would be "patently unfair" to require a party to file a petition for a writ of certiorari prior to receiving the decision on which such a petition would be based. We disagree with this argument.

The Navy was on notice throughout the entire rate-docket proceeding regarding the statutory time constraints governing the issuance of the commission's report and order. On June 26, 1992, the commission issued an order indicating that the phase 1 rate implementation would be delayed until September 26, 1992, with a report and order to follow on September 28, 1992. It is well settled that "[t]he mandate of § 39–3–11 is that the commission not take longer than eight months to decide on the original filed rates." *Providence Gas Co. v. Burke*, 475 A.2d 193, 196 (R.I.1984). The initial filing for the proposed

rate change was December 27, 1991, to be effective January 27, 1992. The eight-month deadline for the commission report and order was actually September 27, 1992, which fell on a weekend and was therefore extended to September 28. In addition, all counsel of record received a copy of the commission's Final Schedule, which incorporated this statutory mandate and indicated the date for the final report and order.

It was incumbent upon the counsel for the Navy to obtain a copy of this report and order. This could have been done easily by requesting an Express Mail copy, or having local counsel for the United States government, the U.S. Attorney, procure a copy from the commission directly. The Navy's phone calls to the commission were obviously not sufficient to meet its obligation to secure a copy to review the decision in order to file a timely petition. The Navy's argument and explanation for the lateness in filing do not warrant relief by this court. We shall continue to adhere to our decision in *Interstate Navigation Co. v. Burke*, which requires compliance with § 39-5-1 when a party is seeking review of a decision of the commission.

■ The request for a common-law writ will be considered only in the most extraordinary circumstances because the seven-day filing period provides an adequate remedy at law for parties aggrieved by a commission decision. Our determination of whether a particular case is extraordinary enough to warrant common-law certiorari, when a party has failed to comply with the statute, will be considered on a case-by-case basis.

■ In the case before us we find the commission's blatant interference in the contract between the Navy and the company, in excess of its authority, to be extraordinary enough to warrant such review. We therefore grant the petition for common-law certiorari and consider the merits of the entire case before us. It is only because of the commission's actions with regard to the contract between the company and the Navy that we are persuaded to consider the issues before us on their merits rather than deny the petition on procedural grounds.

## II

Moving on to the first substantive issue, we now consider whether the commission acted reasonably in accepting the rate-class revenue requirements and rate-design stipulations. We conclude that it did.

■ Under title 39 of the General Laws the commission has broad powers governing utility regulation. *Rhode Island Chamber of Commerce Federation v. Burke*, 443 A.2d 1236, 1237 (R.I.1982). The commission is charged with weighing the various competing interests in the formation of regulatory policy. *Providence Gas Co. v. Burke*, 119 R.I. 487, 497, 380 A.2d 1334, 1339 (1977). We shall continue to give great deference to the decisions of the commission and shall not overturn them unless they are clearly wrong and grossly unreasonable. *Roberts v. Narragansett Electric Co.*, 490 A.2d 506 (R.I.1985); *Bristol County Water Co. v. Harsch*, 120 R.I. 223, 386 A.2d 1103 (1978); *Narragansett Electric Co. v. Harsch*, 117 R.I. 395, 368 A.2d 1194 (1977). In addition we shall not "sit as either a policy-making body or a factfinder in commission matters when reviewing rate-making cases and utilities regulation." *Town of Narragansett v. Malachowski*, 621 A.2d 190, 198 (R.I.1993) (citing *Providence Gas Co. v. Malachowski*, 600 A.2d 711, 714 (R.I. 1991); *Block Island Power Co. v. Public Utilities Commission*, 505 A.2d 652, 653 (R.I. 1986); *Providence Gas Co. v. Burke*, 119 R.I. 487, 497, 380 A.2d 1334, 1339 (1977)).

■ Our standard of review governing the commission decisions is clear and well established. When we review a decision of the commission, our determination is limited to whether the commission's ruling is lawful and reasonable and whether its findings are substantially supported by legal evidence. *Newport Electric Corporation v. Public Utilities Commission*, 624 A.2d 1098, 1101 (R.I.1993); *South County Gas Co. v. Burke*, 486 A.2d 606, 608 (R.I.1985); *Wakefield Water Co. v. Public Utilities Commission*, 457 A.2d 251, 253 (R.I.1983); *New England Telephone & Telegraph Co. v. Public Utilities Commission*, 446 A.2d 1376, 1380 (R.I.1982).

In making that determination, we shall not exercise independent judgment or weigh conflicting evidence. *Narragansett Electric Co. v. Burke*, 122 R.I. 13, 20, 404 A.2d 821, 826 (1979), *cert. denied*, 444 U.S. 1079, 100 S.Ct. 1031, 62 L. Ed 2d 763 (1980). We shall refuse to engage in factfinding or substitute our own judgment for that of the commission. *Town of Narragansett v. Malachowski*, 621 A.2d 190, 198 (R.I.1993); *Providence Gas Co. v. Malachowski*, 600 A.2d 711, 714 (R.I.1991); *Interstate Navigation Co. v. Burke*, 465 A.2d 750, 755 (R.I.1983). If the findings of the commission are substantially supported by legal evidence, they are " 'generally unassailable on review.' " *Valley Gas Co. v. Burke*, 446 A.2d 1024, 1030 (R.I.1982). With that standard in mind, we now look to findings of the commission challenged by the Navy.

The Navy argues that the increased rate of 3.38 percent, equivalent to $354,000, imposed on it by the commission's decision is unjust and discriminatory in view of cost-of-service studies. Cost-of-service studies are the most widely utilized tool in developing reasonable public utility rates. James C. Bonbright, *Principles of Public Utility Rates*, ch. 15 at 375 (2d ed.1988). "In fact, the golden rule of socially optimal ratemaking is that, whenever possible, prices should track all the identifiable * * * costs occasioned by a service's provision." *Id.*, ch. 5 at 109–10.

We have followed that golden rule of rate making and held that "it is generally recognized that a cost-of-service study is of paramount importance and may indeed be a precondition to consideration of a proposed rate design." *United States v. Public Utilities Commission*, 120 R.I. 959, 967, 393 A.2d 1092, 1096 (1978). The commission has also acknowledged the importance of such cost studies in the rate-making process since 1957. *Id.* (citing *Re Narragansett Electric Company*, 21 P.U.R.3d 113, 144–45 (R.I.D.B.R.1957)).

Each of the parties in this action offered its own cost-of-service study, with differing results before the commission. According to the Company's cost-of-service study, the Navy is producing a 67 percent rate of return

under the rates prior to the increase set forth in the commission's report and order of September 28. This rate of return was determined to be approximately ten times the average rate of return for the company. The study offered by the division revealed a 55 percent rate of return, and the other studies indicated even higher rates. All the cost-of-service studies performed indicated that the Navy was producing a higher rate of return for the Company than any other class of service and that the Navy is being charged rates significantly in excess of the costs to serve it.

In light of the various studies presented, the Navy argues that the 3.38 percent increase in price to the Navy is unreasonable and unjustly discriminatory. The Navy contends that a strict adherence to the cost-of-service basis warrants a decrease in the Navy's rates rather than an increase of 3.38 percent.

Generally it is the burden of the utility seeking the rate increase to establish that the increase is warranted and that it is not discriminatory. *Blackstone Valley Chamber of Commerce v. Public Utilities Commission*, 121 R.I. 122, 396 A.2d 102 (1979); *United States v. Public Utilities Commission*, 120 R.I. 959, 393 A.2d 1092 (1978). The Navy compares the present case with *United States v. Public Utilities Commission*, where a cost-of-service study revealed that the rate of return on service to the Navy was 63.5 percent higher than the return on the cost of providing service to all other customers. The present case is distinguishable from that case.

In the *United States v. Public Utilities Commission* the same parties were involved, the United States Navy and the Newport Electric Corporation. The Navy challenged the company's rate filing as discriminatory because a cost-of-service study indicated that the rate of return for the company on service to the Navy was 63.5 percent higher than that of other customers. We concluded in that case that the commission had improperly allocated the burden for proving that the rate increase was warranted and nondiscriminatory when it stated, " 'The Navy has not

shown that it is discriminated against as compared to other customers of the Newport Electric Corporation of comparable size with respect to the overall sales of the Company[.]'" 120 R.I. at 962, 393 A.2d at 1094.

The burden for proving that the increase was warranted and non-discriminatory should have been on the utility seeking the increase rather than on the Navy. *Id.* at 963, 393 A.2d at 1094. In that case there was no evidence presented by the utility that justified the rate increase to the Navy in light of the cost-of-service study. We remanded the case for further evidentiary proceedings

> "[b]ecause the commission made no attempt either in its report and order or in its brief to justify imposing upon the Secretary the burden of establishing the impropriety of the rate design, we can only speculate on the basis for its action." *Id.* at 963–64, 393 A.2d at 1094.

> "Accordingly, both because the commission erred in assigning the burden of proof with respect to undue discrimination, and also because the commission's factual basis for the 'relatively high investment risk' theory does not measure up to our standards, the case must be remanded for a further hearing limited to approving a rate structure that is both just and reasonable, and not unjustly discriminatory." *Id.* at 965–66, 393 A.2d at 1095–96.

The Navy argues that the present case is similar to *United States v. Public Utilities Commission* in that the company has failed to meet its burden of proof for increasing the rate charged to it. Relying on its own cost-of-service study and similar results of the studies done by the other parties, the Navy contends that there is no justification for the increase. We disagree.

The difference between the two cases is that in this case the company presented significant expert testimony regarding the propriety of a departure from a strict cost-of-service method in rate making to justify the increase. The commission accepted this testimony and found that a strict adherence to the cost-of-service study in this case was inappropriate.

Again we remind the Navy that we shall not reverse the findings of the commission if sufficient evidence and a legal basis to support its conclusions exists. Our job is not to second-guess the commission but rather to ensure that its decisions are reasonable and legally correct.

Historically the cost-of-service basis methodology in rate making has been deemed a reasonable means of setting utility rates. However, we have recognized that there are instances wherein a departure from this rigid structure of rate making is warranted. This court has adhered to the general rule set forth by the United States Supreme Court in *Permian Basin Area Rate Cases,* 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968), stating that

> "rate-making agencies are not bound to the service of any single regulatory formula; they are permitted, unless their statutory authority otherwise plainly indicates, 'to make pragmatic adjustments which may be called for in particular circumstances.'" *United States v. Public Utilities Commission,* 120 R.I. at 966, 393 A.2d at 1096 (quoting *Permian Basin Area Rate Cases,* 390 U.S. at 776–77, 88 S.Ct. at 1365, 20 L.Ed.2d at 342).

■ Although the cost-of-service study has been deemed an essential important factor in determining the propriety of a rate, it is not the only factor to be considered. Some other important factors that may require a departure from a modification of the rates dictated by cost of service are "value of service to the community, historical rate design, adequacy of service, environmental considerations, [and] the public benefit." 120 R.I. at 968, 393 A.2d at 1097.

In the well-respected treatise *Principles of Public Utility Rates* by James C. Bonbright, ten criteria of sound rate structure are delineated. They are as follows:

> "1. Effectiveness in yielding total revenue requirements under the fair-return standard without any socially undesirable expansion of the rate base or socially undesirable level of product quality and safety.
> "2. Revenue stability and predictability, with a minimum of unexpected changes seriously adverse to utility companies.

"3. Stability and predictability of the rates themselves, with a minimum of unexpected changes seriously adverse to rate-payers and with a sense of historical continuity.

\* \* \* \* \* \*

"4. Static efficiency of the rate classes and rate blocks in discouraging wasteful use of service while promoting all justified types and amounts of use \* \* \*.

"5. Reflection of all of the present and future private and social costs and benefits occasioned by a service's provision (i.e., all internalities and externalties).

"6. Fairness of the specific rates in the apportionment of total costs of service among the different rate-payers so as to avoid arbitrariness and capriciousness \* \* \*.

"7. Avoidance of undue discrimination in rate relationships so as to be, if possible, compensatory (i.e., subsidy free with no intercustomer burdens).

"8. Dynamic efficiency in promoting innovation and responding economically to changing demand and supply patterns.

\* \* \* \* \* \*

"9. The related, practical attributes of simplicity, certainty, convenience of payment, economy in collection, understandability, public acceptability, and feasibility of application.

"10. Freedom from controversies as to proper interpretation." James C. Bonbright, ch. 16 at 383–84.

In the present case both the division and TEC–RI presented testimony recommending a greater increase than 3.38 percent. The division witness, David Nichols (Nichols), testified that a strict reliance on the cost-of-service study as advocated by the Navy would fall too harshly on other rate classes. He stated that decreasing the Navy's rate in accordance with the cost-of-service studies would result in substantial increases to the other rate classes. He further stated that "if one customer is to pay less \* \* \* then it means somebody else must pick up that difference if the total cost hasn't changed, which it hasn't."

In his analysis Nichols cited Bonbright and incorporated some of his established criteria of sound rate structure by attempting to maintain rate stability and to avoid undue discrimination. Instead of strictly complying with the cost-of-service study, he derived a formula for apportioning the revenue increase among the various customer classes. In allocating the revenue increase, he developed an index based on class rates of return in the company's preferred cost-of-service study. Applying his study to the initial company request for a revenue increase, he found that a 9.47 percent increase in the Navy's rate was warranted. He concluded that his methodology could be applied in the same fashion to the reduced revenue requirement in stipulation 1, to determine the appropriate level of increase.

Susan Baggett (Baggett) testified for the TEC–RI. She advocated that the Navy should have received a greater increase than provided in the stipulation as a result of the Navy's recent construction of a new substation. She indicated that a departure from the cost-of-service method of rate making was warranted because the costs associated with the company's distribution facilities were no longer needed for the Navy. She testified that

"[d]istribution costs formerly allocated to the Navy are allocated to the other customer classes. This increased the cost to serve the other classes. \* \* \* The Navy is the largest single customer on the Newport system \* \* \*. Consequently, it contributed significantly to the requirements of the distribution system. Setting the allocation to zero unfairly burdens the other classes who receive no additional benefit from this bypass arrangement nor did they cause any additional costs to be incurred. The Company and the Navy should in some fashion bear the burden of these former distribution costs as a business risk and not pass them immediately on to the other classes."

Baggett estimated that these former distribution costs were $1,178,000.

Thus, she took a position that departed from the strict cost-of-service study in favor of an

increase reflecting the impact of the substation.

James J. Bonner (Bonner) testified on behalf of the company. In his testimony he also cited the principles outlined in Bonbright above and concluded that the generally accepted rate-making principles for the development of a sound rate design include continuity and stability, and undue discrimination. He defined rate continuity as "rates [that] change in a gradual and predictable manner over time while allowing existing customers a reasonable time period in which to respond to the changes made." Bonner concluded that a strict application of cost-of-service studies to the rate design would violate the principles of rate continuity and cause drastic changes in rates. In lieu of a strict application of the cost studies Bonner proposed a modified approach which gave his cost-of-service study a one-third weighting with a two-thirds weighting going to an across-the-board increase over current rates. The stipulations reflected his modification and weighting proposal.

Bonner found the stipulations to be reasonable because the cost-of-service study, stability concerns, and "continuity constraints" were all reflected in the proposed scheme. In addition the parties to the stipulations placed a limit on the increase to any one rate class to twice the approved percentage increase in net revenues. This limitation was designed to ensure that the rates change in a gradual and predictable manner.

Stipulation 1 pertaining to the company's overall revenue requirement provided for an increase of 6.6 percent. The overall effect of the proposed rate on the Navy is an increase of 3.38 percent. In considering the reasonableness of this increase, the commission had to review the impact on the other rate classes. According to the company's revised schedules, a strict adherence to the cost-study approach would have resulted in rate increases of up to 90 percent for some classes.

We conclude that the rate increases accepted by the commission do not suggest any discrimination against the Navy. The Navy's increase of 3.38 percent was the lowest of all the classes. Five other rate classes received increases of between 10.27 and 12.94 percent. The remaining four classes received increases ranging from 5.74 to 7.64 percent.

The commission was clearly justified in accepting the stipulated increase proposal. The concerns of "rate shock" and continuity warrant this modification from the cost-of-service study. In addition the commission was justified in not relying totally on the cost-of-service study because the study was "the first cost study submitted by Newport in eight or more years which has appropriate load research data for a meaningful cost of service study." The commission reasonably concluded, on the basis of all of the expert testimony it had before it, that "[w]e cannot rely on a single study period of one year to impose the impact on ratepayers recommended by the Navy."

There is substantial evidence in the record to support the commission's acceptance of the rate-class revenue requirements and rate-design stipulations. We shall not second-guess the conclusions of the commission based on that evidence or question the policy-making decisions regarding stability and rate continuity. *Town of Narragansett v. Malachowski*, 621 A.2d 190 (R.I.1993). We conclude that the findings of the commission with regard to the Navy's 3.38 percent rate increase are reasonable, lawful, and nondiscriminatory.

### III

The third issue relates to the restrictions that the commission placed on the proposed redesign of the Navy's C–1 rate set forth in stipulation 3. In the September 28 report and order, the commission placed ancillary service restrictions on the Navy, restricting its use of electric service for supplementary, backup or maintenance power purposes. The Navy argues that these restrictions interfere with a preexisting contract between the Navy and the company and that the commission had no jurisdiction to change the terms of this contract. We agree.

The division argues that the contract in dispute was never entered as an exhibit in the proceedings before the commission and is therefore not a part of the record before this

court. Although it is true that the contract was never entered as an exhibit, its existence is undisputed by the parties. The proposed C–1 rate redesign is a modification of the provisions of that contract. In addition the change in the language of the contract in the redesigned rate C–1 relates only to the company's dealings with the Navy and no other customer. Since the existence of the contract is not in dispute and the proposed restriction relates specifically to that contractual relationship between the parties, we are compelled to address this issue.

The redesigned C–1 rate structure proposes language that places limitations on the Navy's use of power. The commission's report and order unfairly described the Navy's position with regard to this restriction. Relying only on an excerpt of the prefiled written testimony of the Navy, the commission concluded that the Navy was in agreement with the rate redesign. Although the witness for the Navy, Maurice Bonbaker, stated that he found the redesigned rate a "reasonable step in the right direction—that is, higher demand charges and lower energy charges," he clearly made his objections to the "overly restrictive" provisions specified in his testimony.

The commission did not even address the Navy's objections to these restrictions at all. Instead it decided that the implementation of the new C–1 rate was proper on the basis of the Navy's endorsement of the rate in its prefiled testimony. The commission was incorrect in its characterization of the prefiled testimony as an endorsement of the proposed C–1 rate redesign. The Navy previously refused to enter into stipulation 3 pertaining to the C–1 rate redesign and made clear in its prefiled testimony its concerns regarding the limitations on its existing contractual relationship with the company.

Before us the Navy argues that the proposed language interferes with an existing contractual agreement and relationship. A limitation on the use of electricity as provided in this contract alters the terms of the contract. Such alteration is prohibited.

 Under federal law, state commissions cannot restrict the ability of the Navy in the exercise of its ability to create con-tracts concerning the use of federally owned property. *Black Hills Power & Light Co. v. Weinberger,* 808 F.2d 665 (8th Cir.), *cert. denied,* 484 U.S. 818, 108 S.Ct. 73, 98 L.Ed.2d 36 (1987). Federal procurement, including procurement of utility services, is governed by federal procurement regulations.

 The prohibition on interference in a federal government contract by a state agency extends to the commission's proposed redesign of rate C–1. We conclude that the limitation placed on the Navy by the commission in its acceptance of the stipulation was outside the bounds of the commission's authority. Generally a contractual relationship between the parties can be altered or modified only by a mutual agreement of the parties supported by consideration. *Angel v. Murray,* 113 R.I. 482, 492, 322 A.2d 630, 636 (1974). A unilateral restriction imposed by the commission altering the provisions of the existing contract between the Navy and the company is prohibited by both federal procurement regulations and basic contract law. The restriction is therefore removed, and the contract remains as it previously existed between the parties unless it is modified by further negotiations between them.

For these reasons the petition for certiorari is granted in part and denied in part. That portion of the report and order which pertains to the redesign of the Navy's C–1 rate is quashed. The remainder of the report and order is affirmed and the papers of the case are remanded to the Public Utilities Commission with our decision endorsed thereon.

MURRAY, J., did not participate.