**Supreme Court**

No. 2013-48-M.P.

(Docket No. 4237)

In re:  Proceedings to Establish a Contact    :

    Voltage Detection and Repair Program    :

    Applicable to National Grid Pursuant to    :

Legislation—Review of RFP Process and    :

Recommended Survey Schedule for 2013.    :

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re:  Proceedings to Establish a Contact  :
    Voltage Detection and Repair Program  :
    Applicable to National Grid Pursuant to  :
Legislation—Review of RFP Process and  :
Recommended Survey Schedule for 2013.  :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Robinson, for the Court.**  The Narragansett Electric Company d/b/a National Grid (the NEC) and the Division of Public Utilities and Carriers (the Division), collectively the respondents, have moved to quash a writ of certiorari issued by this Court on February 15, 2013, pursuant to G.L. 1956 § 39-5-1.  The respondents contend that the petition entitled "Petition for Issuance of a Writ of Certiorari Pursuant to Rhode Island General Laws Section 39-5-1 of Power Survey Company"[1] was not timely filed.[2]  This case came before the Supreme Court pursuant to

---

[1]    Many of the documents in the record which are quoted in this Court's discussion use all capital letters, are underlined, or employ bold-face type.  We have conformed those quotations to our usual style throughout this opinion.

[2]    General Laws 1956 § 39-5-1 provides in pertinent part as follows:

> "Any person aggrieved by a decision or order of the commission may, within seven (7) days from the date of the decision or order, petition the supreme court for a writ of certiorari to review the legality and reasonableness of the decision or order. The petition for a writ of certiorari shall fully set forth the specific reasons for which it is claimed that the decision or order is unlawful or unreasonable. Chapter 35 of title 42 shall not be applicable to appeals from the commission. The procedure established by this chapter shall constitute the exclusive remedy for persons and

an order directing the parties to appear and address the issues raised by respondents in their motions to quash. After a close review of the record and careful consideration of the parties' arguments (both written and oral), we grant the motions of the NEC and the Division to quash the writ of certiorari issued by this Court on February 15, 2013.

# I

## Facts and Travel

This case arose from the efforts of the NEC, the Division, and the Rhode Island Public Utilities Commission (the Commission) to comply with G.L. 1956 § 39-2-25, as enacted by P.L. 2012, ch. 162, § 1, which statute is entitled "Contact voltage, detection, repair and reporting"[3]

---

companies aggrieved by any order or judgment of the commission * * * ."

[3] General Laws 1956 § 39-2-25(a) defines "contact voltage" as follows:

"As used in this section 'contact voltage' means and/or refers to a voltage resulting from abnormal power system conditions that may be present between two (2) conductive surfaces that can be simultaneously contacted by members of the general public and/or their animals. Contact voltage is caused by power system fault current as it flows through the impedance of available fault current pathways. Faults contributing to contact voltage may be due to electric system deterioration or damage, or improper installation. Contact voltage is of greatest concern in areas where underground electric distribution systems exist, as faults on those systems may remain active for long periods of time before detection and repair, and therefore contact voltage is a potential shock hazard."

Contact voltage has been responsible for the deaths of both pedestrians and house pets. See Aaron Kraut, Advocates Want More Info on Local 'Contact Voltage' Risk, http://www.bethesdanow.com/2013/12/11/advocates-want-more-info-on-local-contact-voltage-risk/ (last visited May 27, 2014); Erik Lacitis, Dog electrocuted from Seattle sidewalk power plate, http://seattletimes.com/html/localnews/2013551882_dog30.html (last visited May 27, 2014); see generally, Contact Voltage Information Center, What is contact voltage? The issue., http://www.contactvoltageinfo.org/the-issue/ (last visited May 27, 2014).

(the Contact Voltage Statute) and was enacted by the General Assembly in 2012. That statute requires the Commission and the Division to do the following:

> "[They] shall initiate a proceeding within forty-five (45) days of the effective date of this section, to establish, after notice and provision of the opportunity for comment and public hearing, a contact voltage detection and repair program. The program shall require electric distribution companies to implement appropriate procedures to detect contact voltage on publicly accessible surfaces which could become energized by contact voltage due to faults in the underground distribution system. The program shall also recognize the potential for publicly accessible objects such as sidewalks, roadways, fences, storm drains, or other metallic gratings to become energized by faults to the underground distribution system." Section 39-2-25(b).[4]

---

[4]    Section 39-2-25(b) goes on to require the NEC to do as follows:

> "(1) **Designate contact voltage risk areas.** The boundaries of such areas shall be approved by the commission and shall be based on the presence of underground electric distribution and situated in pedestrian-dense areas such as urban neighborhoods, commercial areas, central business districts, tourist heavy locations, and other places where pedestrians could be exposed to contact voltage;

> "(2) By June 30, 2013, conduct an initial survey of no less than forty percent (40%) of designated contact voltage risk areas, for contact voltage hazards on all conductive surfaces in public rights-of-way using equipment and technology as determined by the commission;

> "(3) Beginning July 1, 2013, annually survey no less than twenty percent (20%) of designated contact voltage risk areas, for contact voltage hazards on all conductive surfaces in public rights-of-way using equipment and technology as determined by the commission;

> "(4) Repair power system faults of the electric distribution company's underground distribution system, that result in contact voltage appearing on publicly accessible surfaces of a level to be determined by the division of public utilities;

> "(5) If during a survey for contact voltage hazards on conductive surfaces in public rights-of-way, an energized surface

Section 39-2-25(d) states that the Commission "shall review and determine which equipment and technology shall be used for the surveying of contact voltage * * * ."

In an effort to comply with the statute, the NEC went through the process of developing a contact voltage program and seeking approval by the Commission of various aspects of the program. The issue now before the Court deals specifically with the portion of the program which involved issuing a "Request for Proposal" (RFP) to obtain proposals from vendors with respect to contact voltage testing. Power Survey Company (Power Survey) was one of the vendors that responded to the RFP, but it was not ultimately selected by the NEC to perform the contact voltage testing. Before this Court, Power Survey contends that the Commission "improperly interpreted and applied" the Contact Voltage Statute when it approved the just-discussed portion of the NEC's contact voltage program—namely, the portion providing for the issuance of a RFP for the purpose of choosing a vendor to provide the technology for the NEC's contact voltage testing.

At present, we are concerned only with the motions of the NEC and the Division to quash the writ of certiorari and not with the substantive merits of the case. However, in order to

is identified and the proximate cause is found not to be a utility company asset, then the utility company has no legal duty; however, the company may: clearly designate the area as a contact voltage hazard, and/or notify the account owner or owner of the asset causing the contact voltage hazard, and inform the owner of his/her obligation to perform all necessary repairs consistent with the terms contained in this section;

"(6) Annually report on contact voltage findings, including, but not limited to, the number and type of energized objects on both company-owned and customer-owned assets, voltage level, corrective action taken, shocks that occur to members of the public or to pets owned by members of the public, and any other information that the commission deems appropriate."

properly address the motions to quash, we need to delve deeper into the manner in which this case proceeded before the Commission.

The NEC submitted a "Proposed Rhode Island Electric Contact Voltage Program" (Proposed Program) to the Commission for its approval; it was received by the Commission on August 20, 2012. The Proposed Program specifically referenced the NEC's intention to "issue a Request for Proposal * * * for mobile technology services for the contact voltage program." According to the cover letter from the NEC attached to the Proposed Program, a proposed "pilot [test][5] designed to compare performance of vendor equipment when surveying comparable Company-designated contact voltage areas" was also included in the Proposed Program. The Division supported the proposed RFP, making particular reference to the pilot test, and it urged the NEC and the Commission to reject any vendors that refused to participate in the pilot test, stating:

> "To the extent a vendor refuses to participate is [sic] such a pilot [test] assessment, the [NEC] should consider that Vendor a non-responsive bidder and proceed without consideration of that Vendor's system and process."[6]

The NEC stated that, in following the Division's recommendation, it would reject any vendors that refused to participate in the pilot test.

On October 2, 2012, the NEC submitted a revised version of its Proposed Program (Revised Program) to the Commission. Subsequently, on November 9, 2012, after receiving the

---

[5] That just-mentioned "pilot test" is referred to in the record at various times as a pilot test, a pilot program, a pilot project, and a pilot survey. For the sake of clarity we will refer to it as a pilot test.

[6] On September 18, 2012, the Division submitted a document entitled "Prefiled Direct Joint Testimony of Gregory L. Booth * * * and Michael W. White * * * ." The testimony in that document supported the pilot test and urged the NEC to disqualify any vendor who refused to participate.

Revised Program and other post-hearing submissions, the Commission issued a written order (the Process Order). As indicated in that order, the Commission: (1) found the RFP process to be a "reasonable approach to choosing a vendor" and approved the issuance of a RFP including the pilot test; (2) approved the use of a pilot test; (3) concluded that participation in the pilot test "should verify whether one vendor is superior to another;" (4) approved the decision to disqualify any vendor that refused to participate in that pilot testing; and (5) noted that the Commission "will not be choosing the vendor." The Process Order contained language which informed "[a]ny person aggrieved by a decision or order of the Commission" that such a person had a right to "petition the Supreme Court for a writ of certiorari to review the legality and reasonableness of the decision or order." Notably, Power Survey did not petition this Court for a writ of certiorari in order to challenge the Process Order.

The NEC issued a RFP on November 26, 2012. On December 17, 2012, the NEC filed a report of the results of the RFP with the Commission. Two potential vendors had responded to the RFP, one of which was Power Survey; however, it is undisputed that Power Survey expressly informed the NEC that it would not participate in the pilot test. Consequently, and in accordance with the Process Order and the Division's recommendation, the NEC moved forward with the other vendor. The Division filed the only response to the NEC's report, in which it endorsed the "RFP award recommendations" and stated that the NEC had complied with the Process Order.

In spite of the fact that it had not sought to intervene in the proceeding before the Commission, Power Survey filed public comment with the Commission alleging that the RFP and the pilot test were flawed. The NEC responded on January 24, 2013. On February 1, 2013, the Commission issued a written order (the Compliance Order) which noted: (1) that the NEC

had properly complied with the Process Order; and (2) that the Commission was "disappointed" with Power Survey's actions with respect to the RFP process.

On February 8, 2013, Power Survey filed a petition for a writ of certiorari, purportedly attacking the Compliance Order. This Court issued a writ of certiorari on February 15, 2013.[7] On April 19, 2013 and April 26, 2013 respectively, the NEC and the Division filed motions to quash the February 15, 2013 writ of certiorari as having been improvidently granted, and it is those motions to quash with which we are concerned in this opinion.

## II

### Issue

We are called upon to decide whether or not Power Survey's petition for a writ of certiorari, purportedly challenging the Compliance Order, is time-barred due to the fact that, as the Division and the NEC contend, Power Survey is actually challenging the Process Order and failed to bring that challenge within seven days of the issuance of the Process Order as is required by § 39-5-1.

## III

### Analysis

The NEC contends that it is "apparent from the substance of Power Survey's petition and memorandum * * * that Power Survey is challenging the Commission's Process Order" rather than the Compliance Order which Power Survey claims to be challenging. The NEC argues that it is clear that the Process Order and not the Compliance Order is actually being challenged because it was the Process Order that explicitly approved the disqualification of vendors that refused to participate in the pilot testing and, as such, "Power Survey cannot be a successful

---

[7]  It is significant that the instant case involves a statutory writ of certiorari (see § 39-5-1) and not a common law writ of certiorari.

vendor unless it reverses the Process Order." The NEC further contends that it is "well-settled" that only the most recent order may be considered in a case in which a statutory petition for a writ of certiorari has been filed; it posits that any topic relating to earlier unappealed orders is not properly before the Court on a petition for a writ of certiorari involving a challenge to a later order. Consequently, the NEC avers that Power Survey's "deliberate decision to sit on the periphery of the proceedings before the Commission and not intervene in those proceedings or challenge the [Process Order] approving the request for proposals process," dooms its petition for a writ of certiorari since it should have challenged the Process Order—which it uncontestably failed to do. The Division, in its statement filed before this Court entitled "Division's Memorandum of Law in Support of its Motion to Quash Writ of Certiorari," largely echoes the just-summarized arguments of the NEC.

In contrast, Power Survey contends that it is challenging the Compliance Order and, consequently, that, its petition was in fact timely.[8] Power Survey posits that the issues it raised during the public comments period before the Commission are addressed in the Compliance Order. It further posits that the Compliance Order did not merely confirm that the NEC complied with the Process Order; it also approved the NEC's selection of a vendor that, according to Power Survey, had problems with its equipment and produced hundreds of false positives. Additionally, Power Survey notes that, at the time the Process Order was issued, the

---

[8]     Power Survey makes an initial argument that the Division chose not to object to the petition for a writ of certiorari until after the writ of certiorari was issued and that, consequently, any arguments it makes now in support of its motion to quash have been waived. This argument is unavailing. Power Survey's petition is stamped February 8, 2013. The Division's memorandum in support of its objection to the petition was filed on February 20, 2013. Article I, Rule 13(b) of the Supreme Court Rules of Appellate Procedure requires a memorandum in opposition to a petition to be filed within twenty days after service of the petition. Since the Division could not possibly have been served before the petition was filed on February 8, contrary to the contention of Power Survey, the Division's objection was timely.

RFP "had not been issued by [the NEC], no bidder's conference had been held thereunder, all of the criteria to be used for selection of a vendor had not been disclosed to potential vendors, and Power Survey had not been disqualified from anything." Thus, it argues that the Process Order merely approved disqualification of vendors in the future if they chose not to participate in the pilot testing and that, therefore, it was not until the Compliance Order was issued that Power Survey was actually disqualified; in other words, Power Survey argues that it was only potentially disqualified when the Process Order was issued, and, consequently, it had nothing to challenge at that time. Our analysis, therefore, revolves around the question of whether or not Power Survey was, in a legal sense, aggrieved by the Process Order.

Section 39-5-1 requires anyone "aggrieved by a decision or order of the commission" to "within seven * * * days from the date of the decision or order, petition the supreme court for a writ of certiorari * * * ." (Emphasis added.) The General Assembly has characterized § 39-5-1 "as the exclusive appellate remedy" for review of decisions or orders of the Commission. Providence Gas Co. v. Burman, 119 R.I. 78, 84, 376 A.2d 687, 691 (1977) (internal quotation marks omitted). Additionally, we have repeatedly stated that "[t]he period for filing a statutory petition for certiorari under § 39-5-1 cannot be extended." United States v. Public Utilities Commission of Rhode Island, 635 A.2d 1135, 1138 (R.I. 1993); see Providence Water Supply Board v. Public Utilities Commission, 708 A.2d 537, 542 (R.I. 1998). Therefore, if a party fails to meet the seven day requirement, it renders the "findings of the commission nonreviewable," and this Court will dismiss that party's petition for a writ of certiorari. Public Utilities Commission of Rhode Island, 635 A.2d at 1138; see, e.g., Interstate Navigation Co. v. Burke, 465 A.2d 750, 755 (R.I. 1983); Roberts v. Blackstone Valley Electric Co., 423 A.2d 1194, 1194 (R.I. 1980) (mem.).

Thus, our case law makes it clear that, if we determine that Power Survey is challenging the substance of the Process Order, rather than the Compliance Order, then this Court should grant the motions by the NEC and the Division to quash the writ of certiorari on the ground that Power Survey's petition for a writ of certiorari was not timely. See Interstate Navigation Co., 465 A.2d at 752, 754-55 (dismissing a petition for a writ of certiorari where the Commission had issued two orders, but a petition for a writ of certiorari was timely filed only with relation to the second order and stating that the first order had become "nonreviewable"); Eastern Communications Corp. v. Burman, 121 R.I. 311, 315, 397 A.2d 1317, 1319 (1979) (noting that Eastern Communications Corporation claimed to challenge a November 4, 1976 order of the Commission but then determining that its "true target" was a September 13, 1976 order—with respect to which it had failed to file a timely petition for a writ of certiorari). However, if we determine that Power Survey is challenging the substance of the Compliance Order, then its petition was timely since it was filed within seven days of the issuance of the Compliance Order, and we should deny the motions to quash. Accordingly, we proceed to take a closer look at the Process Order, the Compliance Order, and Power Survey's petition for a writ of certiorari.

The Process Order is thirty-two pages long and begins with a comprehensive discussion of the facts and evidence confronting the Commission; it details the testimony presented to the Commission with respect to the NEC's Proposed Program and the post-hearing submissions by the parties. Ultimately, it reflects the decision of the Commission to approve the revised version of the Proposed Program submitted by the NEC, including the RFP. The Commission's Process Order states in pertinent part as follows:

> "The vendor/tester using the mobile technology and associated equipment will be chosen through a proposed RFP.
> "The Commission finds that [the NEC's] RFP Process represents a reasonable approach to choosing a vendor. The

Commission specifically approves the use of a pilot [test] as described at the hearing in this docket. The Division indicated that the pilot survey was a common approach and further recommended that if a bidder did not participate in a pilot testing under the RFP that it be disqualified. The Commission agrees. When public dollars are expended and there is a possibility of competition in the arena, there must be a fair process by which the vendor is chosen. * * * A pilot survey should verify whether one vendor is superior to another and should be factored into the decision." (Emphasis added.)

In the Process Order, the Commission also explicitly states that "it w[ould] not be choosing the vendor." The Compliance Order, on the other hand, is only ten pages long. The Commission reviewed therein what it had said in the Process Order and addressed the NEC's report which summarized the results of the pilot test and identified the NEC's chosen vendor. The Compliance Order proceeds to address Power Survey's arguments with respect to the RFP and the pilot test, which the Commission received as public comment. Most importantly, the Commission found that the NEC "had complied with the RFP Process approved by the Commission in [the Process Order]." It went on to state as follows:

"The Commission is deeply disappointed and rather perplexed with Power Survey's actions in this docket and in the RFP process. If Power Survey truly believes it has a superior product, truly has public safety in mind, and is interested in more than creating a monopoly for itself in the arena of contact voltage mobile testing, it should have had no hesitation about participating in a controlled pilot test. * * * [It] begs the question of why [Power Survey] chose to simply attack the other parties to the process rather than participate in the pilot and seek to establish its superiority through facts rather than conjecture. A bidder to an RFP should not be able to void a pilot, and therefore, an entire RFP, simply by taking its ball and going home and then arguing that if it had stayed, it would have won the game."[9]

---

[9]      In its statement entitled "Power Survey Company's Objection to National Grid's Motion to Quash Writ of Certiorari," Power Survey briefly raises a contention that it was injured by the Compliance Order because "the outlandish dictum contained in the [Commission's Compliance] Order harmed Power Survey's professional reputation." While this contention, as opposed to Power Survey's other contentions, does arise out of the Compliance Order, it was not raised in

- 11 -

The Compliance Order concluded by stating:

> "At this point, all Power Survey can hope to gain through this protracted public comment is to delay the implementation of an important public safety program. That, the Commission will not do."

Having established what issues the Commission addressed in both the Process Order and the Compliance Order we turn now to Power Survey's petition for a writ of certiorari. In its petition, Power Survey asserted: "[T]he program proposed by [the NEC] did not contain 'appropriate procedures' to accomplish the Legislature's express requirements and intent, and was unreasonably geared toward selection of a vendor that would not detect the actual number of risks of electrocution and shocks from [the NEC's] facilities. Accordingly, [the Compliance Order] approving the [RFP and the pilot test] is unlawful and unreasonable and must be vacated."[10] Power Survey further contended that the Commission's approval of the NEC's RFP process and the results thereof was based on its acceptance of the NEC's attempt to select the lowest cost vendor, not the best technology available. In its petition, Power Survey remarked that, in the Compliance Order, "the Commission confirmed its position that [the] RFP process [was] a reasonable approach * * * ." Power Survey additionally stated: "With regard to the selection of mobile testing equipment the Commission ignored the recommendations of expert

---

Power Survey's petition for a writ of certiorari and does not address any actual error by the Commission. Accordingly, we shall consider it no further. See Navieros Inter-Americanos, S.A. v. M/V Vasilia Express, 120 F.3d 304, 316 (1st Cir. 1997) ("It is a basic principle of appellate jurisdiction that we review judgments, not the editorial commentary in opinions.") (emphasis in original).

[10] Power Survey also claimed the RFP process was "severely flawed" and had "resulted in the acceptance of a [contact voltage] detection system that clearly [did] not meet the [Contact Voltage Statute's] requirements."

witnesses that the overall accuracy of mobile scans be evaluated, and approved the use of a vendor selection process where accuracy was secondary to other considerations."

It is abundantly clear to us that, despite Power Survey's contention that it is challenging the Compliance Order, it is in reality challenging the Process Order.[11] It was the Process Order which approved the RFP process and the pilot test. The Compliance Order merely, in the words of Power Survey itself, "confirmed [the Commission's] position * * * that [the] RFP process [was] a reasonable approach * * *." (Emphasis added.) Moreover, Power Survey has contended that the Commission in the Compliance Order "ignored the recommendations of expert witnesses" and "approved the use of a vendor selection process where accuracy was secondary to other considerations." However, this contention flies in the face of the fact that it was the Process Order which discussed, at length, the testimony of expert witnesses and which ultimately approved the use of the pilot test. It is the Process Order's requirement that there be a pilot test (in which test Power Survey unequivocally refused to participate) that eventuated in Power Survey's inevitable and entirely foreseeable disqualification. Despite the fact that Power Survey had not yet been formally disqualified when the Process Order was issued, it was the requirement of participating in the pilot test which led directly to Power Survey being formally disqualified; our careful review of the record discloses that the details of the RFP and the pilot test, including the provision regarding the disqualification of any vendors that refused to participate in the pilot test, were articulated and approved by the Commission in the Process Order, not in the Compliance Order. Power Survey is essentially trying to challenge the Process

_____

[11] We are not persuaded by Power Survey's argument that, because it attached the Compliance Order to its petition for a writ of certiorari, it was clearly challenging that order, not the Process Order. See State v. Keenan, 68 A.3d 588, 593 n. 4 (R.I. 2013) (noting that this Court has "repeatedly refused" to "elevate form over substance"); see also New Harbor Village, LLC v. Town of New Shoreham Zoning Board of Review, 894 A.2d 901, 905 (R.I. 2006); Sarni v. Meloccaro, 113 R.I. 630, 636, 324 A.2d 648, 651 (1974).

Order through the Compliance Order because it decided not to participate in the pilot test and was, thus, disqualified. However, as is true for all petitioning parties, Power Survey was subject to the requirements of § 39-5-1; in order to challenge the Process Order, it had to file a petition for a writ of certiorari with this Court within seven days. It failed to do so. Accordingly, the Process Order is unreviewable, and we grant the motions filed by the NEC and the Division to quash the statutory writ of certiorari which we issued on February 15, 2013.

Power Survey argues that, even if it is determined that it is the Process Order that is actually being challenged, its statutory petition for a writ of certiorari should be treated by this Court as a petition for a common law writ of certiorari; Power Survey further avers that this Court should grant the petition for a common law writ of certiorari due to the "substantial public interest" in adopting adequate procedures to prevent electrocutions.[12] (Internal quotation marks omitted.) We have held that "[t]his [C]ourt * * * has exclusive jurisdiction to issue a common-law writ of certiorari on occasions in which available remedies are inadequate to safeguard a litigant from substantial harm or injustice." Public Utilities Commission of Rhode Island, 635 A.2d at 1138 (internal quotation marks omitted). Consequently, we "will not issue common law certiorari where the petitioner has failed to utilize another available adequate remedy," Providence Gas Co., 119 R.I. at 84, 376 A.2d at 691, unless "it is shown that unusual hardship or exceptional circumstances would void the benefits of an otherwise adequate remedy at law." Public Utilities Commission of Rhode Island, 635 A.2d at 1138; see also Providence Water Supply Board, 708 A.2d at 542. We consider § 39-5-1 to be an adequate remedy at law. Eastern Communications Corp., 121 R.I. at 315, 397 A.2d at 1319; see also Public Utilities Commission

---

[12] We note that Power Survey fails to cite to any authority in support of its contention that this Court should convert its petition for a statutory writ of certiorari into a petition for a common law writ of certiorari.

of Rhode Island, 635 A.2d at 1138. Thus, after the Process Order was issued, Power Survey had an available remedy in that it could have petitioned for a statutory writ of certiorari in this Court within seven days of the Process Order pursuant to § 39-5-1; it chose not to do so. After a thorough review of the record we perceive no evidence of an "unusual hardship or exceptional circumstance[]" which would warrant the granting of a petition for a common law writ of certiorari. Public Utilities Commission of Rhode Island, 635 A.2d at 1138.[13] Thus, we decline Power Survey's invitation to treat its statutory petition for a writ of certiorari as a petition for a common law writ of certiorari; and we hold that, even if we were to treat the statutory petition as a petition for a common law writ of certiorari, such a petition would be denied.

In conclusion, we hold that, despite the fact that Power Survey contends that it is challenging only the Compliance Order, it is clear from our review of the record that Power Survey's true target is the Process Order; and, because Power Survey failed to petition this Court for a writ of certiorari within seven days of the issuance of the Process Order, as required in § 39-5-1, Power Survey's petition is untimely. We further hold that Power Survey has not satisfied the criteria for the granting of a common law writ of certiorari.

---

[13] Power Survey contends that the NEC may not challenge the issuance of the writ of certiorari because it was not injured and, thus, is not an aggrieved party. We once again note that Power Survey does not cite a single legal authority in support of its argument. The NEC responds that it is clearly a party to these proceedings regardless of whether it was harmed, and it notes that it is the only party involved who is compelled to take any action as a result of the Commission's orders. It points to the fact that § 39-5-2 instructs the clerk that, after a writ of certiorari issues, he or she "shall issue citations to all parties in interest," which would include the NEC. We are in agreement with the NEC that it has standing to move to quash.

The NEC and the Division raise several arguments in support of their motions to quash in addition to those which we have discussed. Given the fact that our determination that Power Survey's petition was not timely is dispositive, we need not delve into the additional arguments asserted by the NEC and the Division.

## IV

## Conclusion

For the reasons set forth in this opinion, we grant the motions of the NEC and the Division to quash the writ of certiorari issued by this Court on February 15, 2013. Accordingly, the February 15, 2013 writ of certiorari is quashed, Power Survey's petition for a writ of certiorari is denied, and the record in this case is remanded to the Commission with our decision endorsed thereon.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**  In re: Proceedings to Establish a Contact Voltage Detection and Repair Program Applicable to National Grid Pursuant to Legislation—Review of RFP Process and Recommended Survey Schedule for 2013.

**CASE NO:**  No. 2013-48-M.P.
(Docket No. 4237)

**COURT:**  Supreme Court

**DATE OPINION FILED:**  May 28, 2014

**JUSTICES:**  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**  Associate Justice William P. Robinson III

**SOURCE OF APPEAL:**  Rhode Island Public Utilities Commission

**JUDGE FROM LOWER COURT**:

N/A

**ATTORNEYS ON APPEAL:**

For Petitioners:  Terence J. Tierney, Esq.

For Respondents:  Adam M. Ramos, Esq.